**STEREO BROADCASTERS, INC., Domino Broadcasting, Inc., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**No. 79–2412.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 16, 1980.

Decided April 22, 1981.

Roy R. Russo, Washington, D. C., with whom N. Frank Wiggins, Washington, D. C., was on the brief, for appellants.

David Silberman, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Keith H. Fagan and L. Andrew Tollin, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

Before TAMM and MIKVA, Circuit Judges, and NICHOLS,* Judge, United States Court of Claims.

Opinion for the court filed by Circuit Judge TAMM.

Concurring opinion filed by Judge NICHOLS.

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

TAMM, Circuit Judge:

This is an appeal from the decision of the Federal Communications Commission to bar a proposed "distress sale" of a radio station license by Stereo Broadcasters, Inc., to a minority-controlled enterprise, Domino Broadcasting, Inc. Because we find that the Commission's decision was not arbitrary, capricious, or an abuse of discretion, we affirm.

## I. BACKGROUND

Under a long-standing policy formulated by the Federal Communications Commission (FCC or Commission) and upheld by this court, *Jefferson Radio Co. v. FCC*, 340 F.2d 781, 783 (D.C.Cir.1974), radio station licensees whose licenses have been designated for revocation hearing, or whose renewal applications have been designated for hearing on basic qualification issues, are forbidden to transfer control of these licenses. Established on the premise that "a licensee . . . has nothing to assign or transfer unless and until he has established his own qualifications," *Northland Television, Inc.*, 42 Rad. Reg.2d (P & F) 1107, 1110 (1978), the policy stems from the Commission's concern for the continued effectiveness of the deterrent provided by, in the appellants' words, the "awesome potential for economic loss that attends deprivation of license." Brief for Appellants at 11. As the Commission has observed:

> [W]here an evidentiary hearing has been designated on a renewal application or show cause order to determine disqualification questions, permitting the suspected wrongdoer to evade sanction by transferring his interest or assigning the license without hearing will diminish the deterrent effect which revocation or renewal proceedings should have on broadcast licensees.

*Northland Television, Inc.*, 42 Rad.Reg.2d (P & F) 1107, 1110 (1978).

■ In May 1978, the Commission created an exception [1] to this general policy with the issuance of its "Statement of Policy on Minority Ownership of Broadcasting Facilities," 68 F.C.C.2d 979 (1978) (Policy Statement).[2] Under the Policy Statement, licensees whose licenses have been designated for hearing will be permitted to transfer their licenses, provided that the transfer is at a "distress sale" price to an entity with a significant minority ownership interest, and that the transaction meets other Commission requirements. *Id.* at 983. The purpose of the exception was set forth clearly as the promotion of minority ownership of broadcasting facilities. The Commission believed that the potential loss of deterrence resulting from the implementation of the exception would be outweighed by the administrative economies it would make possible. It noted that "[t]he avoidance of time consuming and expensive hearings will more than compensate for any diminution in the license revocation process as a deterrent to wrongdoing." *Id.*

The Commission's concern for deterrence was not wholly subordinated, however, to its desire for increased minority ownership. Realizing that, as the Commission later expressed it, "licensees generally cannot be permitted, far less encouraged, to knowingly play roulette with Commission licensing processes," Clarification of Distress Sale Policy, 44 Rad.Reg.2d (P & F) 479, 481 (1978), the Commission limited the distress sale exception to cases in which the hearings had not yet begun. The imposition of this limitation on the exception's availability will prevent a licensee from proceeding into the hearings, evaluating the evidence presented against him, and deciding on that basis whether to seek out a minority purchaser. In this manner the Commission believes that its goal of increased minority ownership can be promoted at a minimum cost to deterrence.

To secure further the promotion of its goals, the Commission decided to evaluate each case on its own merits, to determine whether the goals of the Commission will be advanced by permitting the exception in a particular case. For this reason, the Commission stated, it had decided for the present not to proceed with the formulation of a "rigid rule." *Id.*

Subsequent to its issuance of the Policy Statement, the Commission decided to expand distress sale eligibility to include those "transition" cases—cases which were already in hearings at the time of the Policy Statement—in which no initial decision had yet been issued. Announcing this decision in the Clarification of Distress Sale Policy, 44 Rad.Reg.2d (P & F) 479 (1978) (Clarification), issued on October 11, 1978, the Commission explained that such expansion "will work to further encourage minority ownership without adversely affecting the Commission's interest in preserving its sanctions

---

1. Two exceptions existed previously: one allowing seriously ill licensees to transfer their licenses, the other allowing licensees in bankruptcy to transfer their licenses under certain conditions. One of the requirements of this latter exception was that the licensee himself benefit only slightly, if at all, from the transfer. *See, e. g.,* Second Thursday Corp., 25 F.C.C.2d 112, 113–15 (1970).

2. The Policy Statement was issued under the authority of 5 U.S.C. § 553(b)(A), which excludes "general statements of policy" from the rulemaking requirements of the Administrative Procedure Act. The parties agree that this was the appropriate means of announcing the new policy, which the Commission intended to implement on a case-by-case basis. The consequence of proceeding in this manner, however, is that "[w]hen the agency applies the policy in a particular situation, it must be prepared to

support the policy just as if the policy statement had never been issued." *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir. 1974) (footnote omitted). The Commission attempts to circumvent this burden by distinguishing *Pacific Gas & Electric* on the basis of the substantial public participation in the formulation of the policy in this case; we believe that in this respect, however, all "general statements of policy" are alike. We note, however, that the policy at issue here—not permitting distress sales after the rendering of an initial decision—had been implemented in three Commission decisions at the time Stereo's petition was denied. Bartell Broadcasting of Florida, Inc., 45 Rad.Reg.2d (P & F) 1329 (1979); Leflore Broadcasting Co., Inc., 43 Rad.Reg.2d (P & F) 807 (1978); Golden Broadcasting Systems, Inc., 43 Rad.Reg.2d (P & F) 881, 892 (1978).

against misconduct." *Id.* at 481. It continued to refuse the benefits of distress sale eligibility, however, to those licensees whose revocation proceedings or applications for renewal had already progressed to an initial decision.

The Commission applied the policy set out in the Clarification in *Bartell Broadcasting of Florida, Inc.*, 45 Rad.Reg.2d (P & F) 1329 (1979), where it denied, for the reasons given in the Policy Statement and the Clarification, the application for distress sale eligibility made by a licensee whose renewal application had proceeded to an initial decision. Subsequently, Stereo Broadcasters, Inc., (Stereo) applied for permission to make a distress sale, despite the fact that its application for license renewal had already progressed to an unfavorable decision by an Administrative Law Judge (ALJ) at the time of the Policy Statement.[3] Again reciting the reasoning of the Policy Statement and Clarification, the Commission denied distress sale eligibility. *Stereo Broadcasters, Inc.*, 74 F.C.C.2d 543 (1979), Joint Appendix (J.A.) at 43. Stereo and Domino Broadcasting Company appeal from this order.

## II. DISCUSSION

Appellants contend that it is "arbitrary, capricious, [or] an abuse of discretion"[4] for the Commission to distinguish between transition cases on the basis of whether an initial decision has been issued. Moreover, they believe that the factors involved in the formulation of the distress sale policy, as set forth in the Policy Statement and the Clarification, actually support Stereo's application for permission to engage in a distress sale. Thus, appellants do not challenge the distress sale policy itself, but only the Commission's application of the various factors to their case.

Of the three factors which figure in the various Commission pronouncements—promotion of minority ownership, deterrence, and administrative economy—only two are at issue here. There is no controversy surrounding the minority ownership question in this case. The proposed transferee, Domino Broadcasting Company, is under black ownership; the transfer would therefore result in an additional license controlled by minority owners.

As to administrative economy, appellants argue that even though the hearings leading to the initial decision have been completed, substantial economies may still be realized in this case through the avoidance of a possible appeal of the initial decision and the avoidance of the comparative hearing required to fill the vacancy should Stereo be disqualified. While not addressing this issue squarely, the Commission seems to take the position that such economies simply do not fall within the scope of the policy in question. The administrative resources conserved by the policy are those connected with the certain hearings on renewal and revocation issues, not those connected with "speculative" appeals. Because the former savings are not available in this case, "an important basis" for permitting distress sales is removed. *Stereo Broadcasters, Inc.*, 74 F.C.C.2d at 546, J.A. at 46. The Commission rejected this identical contention in *Bartell*, 45 Rad. Reg.2d (P & F) at 1332.[5]

---

**3.** The initial decision was released on November 25, 1977. Stereo petitioned for permission to make the transfer on April 20, 1979.

**4.** The relevant standard is set forth at 5 U.S.C. § 706(2)(A) (1976).

**5.** Appellants also contend that it is inherently arbitrary and improper for the Commission to make decisions of this kind on the basis of administrative economy. They advance the proposition that the Commission can discriminate against two similarly situated parties only

on some grounds related to its statutory purpose, and not on the basis of its own convenience. Although in the abstract this proposition is both sensible and correct, *cf. Garrett v. FCC*, 513 F.2d 1056, 1060 (D.C.Cir.1975); *United States v. Udy*, 381 F.2d 455, 458 (10th Cir. 1967); *Melody Music, Inc. v. FCC*, 345 F.2d 730, 733 (D.C.Cir.1965), it is inapplicable to the case before us. The Commission did not rely solely on its own administrative convenience in denying Stereo's petition. See the discussion of deterrence *infra*.

We believe that the disposition of this case depends on our review of the related considerations that the Commission groups together as "deterrence." The Commission believes that once an initial decision has been issued and, as here, the Administrative Law Judge has decided against renewing the license, the "integrity" of the administrative process would be weakened by permitting a distress sale. *Stereo Broadcasters, Inc.*, 74 F.C.C.2d at 545, J.A. at 45. It analogizes its decision not to allow such sales to the decision of the judicial system not to allow plea bargaining after conviction. Although the analogy is imperfect, it does communicate the Commission's view of the values at stake in this case. As we understand it, the idea is that the threat of a hearing and the hearing process itself would become less effective as deterrents if the "awesome loss" associated with revocation or non-renewal of a license were to be neutralized in this fashion.

A related but distinct consideration arises from the Commission's reluctance, in general, to grant such relief where "possible wrongdoers might be benefitted substantially thereby" because "such a benefit would be inconsistent with the public interest." *Second Thursday Corp.*, 25 F.C.C.2d 112, 113 (1970) (citation omitted). The Commission believes that this point takes on special importance where an ALJ has found the "possible wrongdoer" unworthy of retaining his license: it suggests that there is an "anomaly" in "allowing a licensee to profit from the sale of his station when it had been judicially determined by an agency officer that he had no rights in the situation because of his failure to respect the duties imposed by the Commission itself." Brief for Appellee at 16.

Appellants base their challenge in this deterrence context on the impermissibility of using the fact of an initial decision to separate one licensee from another. Emphasizing that Stereo has filed exceptions to the decision of the ALJ and that the Commission, not the ALJ, is statutorily designated to decide who is a wrongdoer, they urge that the decision of the ALJ is without legal effect. As Stereo argued in its Petition for Special Relief:

> [I]t is unfair to differentiate among licensees in the hearing process on the basis of anything less than a final determination of the issues in question. To give determinative weight to a recommendation reached part way through the hearing process would be inconsistent with the adjudicatory scheme which the Commission itself has adopted.

J.A. at 13–14.

Moreover, appellants urge that deterrence considerations generally are of no concern in the context of transition cases, since the transition class of cases is limited to those in hearings at the time the Policy Statement was issued. Thus no licensee could interpret a ruling favorable to appellants as an invitation to engage in "roulette" because the Policy Statement, operating prospectively, requires the "distress sale" decision to be made prior to the commencement of hearings.

The Commission responds that the existence of an initial decision is indeed relevant:

> An initial decision is not a mere report to be arbitrarily disregarded. In the absence of review, the initial decision is the decision of the agency. Section 557(b) of the Administrative Procedure Act. Even when review is granted, the initial decision must be taken into account by the agency and when necessary by a reviewing court.

*Stereo Broadcasters, Inc.*, 74 F.C.C.2d at 546, J.A. at 46 (citations omitted). The Commission also contends that the "integrity of the process" concerns in this case outweigh appellants' claim as to the limited nature of the class in a position to be deterred.

■ We believe that it was not arbitrary, capricious, or an abuse of discretion for the Commission to deny Stereo's Petition for Special Relief in this case. We think that the decision was consistent with the longstanding policy of the Commission not to allow transfers of licenses in similar circumstances. The Commission's interests in pre-

serving the integrity of the administrative process and not benefiting alleged wrong-doers, as articulated in earlier cases, apply equally in this case. Its reasons for refusing to apply the minority ownership exception in these circumstances have been clearly expressed both in the Policy Statement and subsequently.

■ We do not say that we would draw the same line, or establish the same policy, if we were considering the matter de novo. Where the Commission is engaged in the process of drawing lines, of making judgmental decisions, however, it is our duty to accord respect to the Commission's expertise. *FCC v. WNCN Listeners Guild*, —— U.S. ——, ——, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981). The Supreme Court has stated:

> In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; "a forecast of the direction in which future public interest lies necessarily involves deductions based upon the expert knowledge of the agency."

*FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978) (citations omitted). *See* 3 K. Davis, Administrative Law Treatise § 15.10 (2d ed. 1980). *See also Capital Cities Communications, Inc. v. FCC*, 554 F.2d 1135, 1139 (D.C.Cir.1976). We are convinced that the "facts" that formed the basis upon which the Commission established its minority ownership policy—*e. g.*, that permitting a distress sale following an initial decision would have a harmful effect on the integrity of the administrative processes—are the kinds of judgmental or predictive facts that are entrusted to the Commission's discretion, and not to this court's.

## III. CONCLUSION

Our task is to review the Commission's decision to ensure that what should have been an exercise of informed discretion was not, in fact, a dictate of unbridled whim. Our burden is increased when the decision is properly based upon predictions of human behavior, about which even reasonable persons will rarely agree. The administrative record reveals that the Commission had reasons for its decision and that those reasons were not effectively refuted by Stereo. The decision of the Commission is

*Affirmed.*

NICHOLS, Judge, concurring:

I join in Judge Tamm's opinion, but wish to add the following:

We are concerned with application of a remarkable rule of the FCC. Normally they do not allow a broadcast licensee to make a "distress sale," *i. e.*, one effected while renewal of the broadcast license was challenged and under FCC review. In theory he has nothing to sell. Presumably they could not prevent sale of the physical facilities but would not recognize assignment of the license. A purchaser therefore would not have the license and would have to apply for one on equal terms with other applicants. The reason for such a policy is to enforce licensees' good behavior, by holding over them a catastrophic loss in case the license extension is denied for misconduct. If licensees, confronted with imminent revocation of their licenses, could cut their losses by timely sales, they might emerge with some loss, to be sure, but short of bankruptcy. Thus the negative reward for evil doing would be diluted and fear of FCC disappropriation would be made less.

But the FCC has mitigated its policy in order to entice more minority broadcasters into the business. If the erring licensee sells to minority buyers at a material discount under fair market value, and if the buyers qualify for a license, the "distress" nature of the sale will be overlooked provided the inquest into license renewal has not gone too far. A ratemaker similarly might encourage minority users of electricity and increase their consumption of it, by prescribing for them lower rates than nonminority users must pay. The intended effect is to make bargain basement acquisitions of valuable broadcast facilities available to minorities only.

The FCC has however selected a point beyond which it will not carry this policy. That is when the challenge to license renewal has reached the stage when an administrative law judge has found facts adversely to the licensee, concluded it has been guilty of misconduct as a licensee, and recommended against renewal. This is the latest stage allowed. The stopping point is apparently earlier for sales effected after the basic policy was announced. The FCC feels that allowance of a "distress sale" even at a bargain price, and even to minority buyers, when the license is under that great a cloud, would so weaken the usual sanctions that the desire to increase minority ownership must take a subordinate place.

The instant allegedly erring licensee having negotiated a bargain sale to minority buyers, he and the buyer say it is arbitrary and capricious to make the allowability of one of these sales turn on an event otherwise without legal significance, the unveiling of an administrative law judge's decision, which is only tentative, since the FCC can reject or modify it at will.

As the opinion of the court rightly points out, the validity of allowing distress sales to minorities only is not before us in an adversary context. Appellants would benefit from the policy and would push it further than the FCC would agree to, and the FCC of course does not attack its own policy as far as it goes. Those, if any, who deem the policy itself anomalous in our system of laws, are not likely to find it arbitrary and capricious for the FCC in applying it to draw the line at some point. To such persons, whether it is drawn at the closing of proof, at the completion of requests for findings, or of briefs, or at whatever subsequent procedural step the rules may recognize, or on the first Tuesday after the first Friday of the first month lacking an "R," will be matters of indifference. They may say the FCC looks ridiculous in trying so hard to be only a little pregnant, but looking ridiculous and being arbitrary and capricious are not the same.

Who is a minority is not defined in the appellate record, nor does it appear whether the definition is the same in all parts of the country. It is conceded that the coappellant, being black-owned, is one by all definitions. I use the term, therefore, without knowing exactly what it means, but nothing turns on precision here.