931 F.2d 73
 289 U.S.App.D.C. 228, 59 USLW 2656
 COALITION FOR THE PRESERVATION OF HISPANIC BROADCASTING, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Spanish International Communications Corp., Station
Representatives Association, Inc., Fouce Amusement
Enterprises, Inc., Univision, Inc., Intervenors.
HISPANIC BROADCASTING SYSTEMS, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Spanish International Communications Corp., Bahia de San
Francisco Television Co., Seven Hills Television Co.,
Station Representatives Association, Inc., Fouce Amusement
Enterprises, Inc., Univision, Inc., Intervenors.
HISPANIC BROADCASTING LIMITED PARTNERSHIP, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Spanish International Communications Corp., Bahia de San
Francisco Television Co., Seven Hills Television
Co., Station Representatives
Association, Inc., Univision,
Inc., Intervenors.
Susan M. JARAMILLO, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Seven Hills Television Co., Univision Holdings, Inc., et
al., Intervenors.
TVL CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Univision Holdings, Inc., et al., Intervenor.
The COALITION FOR the PRESERVATION OF HISPANIC BROADCASTING,
et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Univision Holdings, Inc., et al., Intervenor.
 Nos. 87-1285, 87-1287, 87-1299, 88-1564, 88-1588 and 88-1596.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 12, 1990.
Decided April 23, 1991.
As Amended May 14, 1991.
 
 Notices of Appeals from an Order of the Federal Communications Commission.
 Morton L. Berfield, with whom Lewis I. Cohen and Roy W. Boyce were on the brief, for appellant Hispanic Broadcasting Ltd. Partnership in No. 87-1299.
 Stephen A. Sharp for appellant Hispanic Broadcasting System in No. 87-1287. Martin E. Firestone also entered an appearance for appellant.
 Katrina Renouf, with whom Margot Polivy was on the brief for appellant Susan Jaramillo in No. 88-1564.
 Bruce A. Eisen was on the brief for appellant Coalition for the Preservation of Hispanic Broadcasting in Nos. 87-1285 and 88-1596.
 James P. Riley and Robert A. DePont were on the brief for appellant TVL Corp. in No. 88-1588.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Robert L. Pettit, Gen. Counsel and Sue Ann Preskill, Counsel, F.C.C. were on the brief for appellee in Nos. 87-1285, 87-1287, 87-1299, 88-1564, 88-1588 and 88-1596.
 Linda K. Smith and David H. Solomon entered appearances for intervenor Station Representatives Ass'n, Inc. in Nos. 87-1285, 87-1287 and 87-1289.
 L. Andrew Tollin and Leon T. Knauer entered appearances for intervenor Seven Hills Television Co. in Nos. 87-1285, 87-1287, 87-1289, 88-1564 and 88-1588.
 N. Frank Wiggins entered an appearance for intervenor Fouce Amusement Enterprises, Inc. in Nos. 87-1285, 87-1287 and 87-1289.
 Richard E. Wiley, John C. Quale, James R. Bayes and Diane Z. Goldman entered appearances for intervenors Spanish Intern. Communications and Univision Holdings, Inc., et al. in Nos. 87-1285, 87-1287, 87-1289, 88-1588 and 88-1596.
 John L. Tierney, Richard F. Swift and Ann Bavender entered appearances for intervenor Bahia de San Francisco Television Co. in No. 87-1287.
 Before MIKVA, Chief Judge, WALD, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS, HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 Dissenting Opinion filed by Chief Judge MIKVA.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 This is an appeal from a Federal Communications Commission decision granting a conditional renewal of several television licenses. We deny the challenges of two petitioners for failure to exhaust administrative remedies and those of two others for want of standing.[1]
 
 
 2
 As the panel opinion presented the facts in detail, see Coalition for the Preservation of Hispanic Broadcasting v. FCC, 893 F.2d 1349 (D.C.Cir.1990), we provide only a summary. Spanish International Communications Corporation and Bahia de San Francisco (collectively "Spanish International") held six TV licenses, the first acquired by Spanish International's corporate predecessors in 1961. In January 1986 an administrative law judge found that Spanish International's relations with certain Mexican interests violated a Communications Act provision forbidding alien ownership of broadcasting stations. See 47 U.S.C. Sec. 310(b). Facing a risk that this issue would doom its efforts to secure license renewal, Spanish International negotiated a settlement agreement under which, immediately upon renewal, it would sell the stations to Hallmark Cards, Inc. In October 1986 the Commission's Review Board approved this settlement and conditionally renewed Spanish International's licenses.
 
 
 3
 At about the time the Review Board acted, petitioners Hispanic Broadcasting Systems, Inc. ("HBS") and Hispanic Broadcasting Limited Partnership filed applications for the licenses and asked the Commission to reverse the Review Board. As the filings came years after the relevant FCC "windows" had closed, the Commission rejected the applications as untimely. Nonetheless, it permitted petitioners to appear before it as amici and considered their argument that the renewal and transfer of Spanish International's licenses violated the FCC's "Jefferson Radio " policy, which prohibits any licensee from transferring a broadcast station at full value while a proceeding that might lead to license forfeiture is pending. See Jefferson Radio Co. v. FCC, 340 F.2d 781, 783 (D.C.Cir.1964). The Commission rejected this argument and affirmed the Review Board's approval of the transfer agreement and license renewal.
 
 
 4
 Two of the challengers are prospective applicants, HBS and the Partnership, and three, the Partnership (in a second capacity), Susan Jaramillo and the Coalition for the Preservation of Hispanic Broadcasting, are purportedly dissatisfied viewers. We hold that (1) HBS and the Partnership may not obtain judicial review because they did not timely invoke the administrative procedures required of prospective applicants; and (2) the viewers do not have standing to sue because they do not fall within the zone of interests contemplated by Sec. 310(b).
 
 The Would-Be Applicants
 
 5
 HBS and the Partnership seek two kinds of relief. First, they ask us to overturn the FCC's decision to reject their applications as untimely. We deny this relief for the reasons stated by the panel opinion. 893 F.2d at 1357-59. That resolved, we turn to whether such untimely applicants may now, in the hope of vacant channels and new filing opportunities, ask this court to overturn the FCC's approval of the renewal and transfer agreement.
 
 
 6
 Both panel opinions and, upon rehearing, the litigants themselves treated this issue as a matter of Article III standing: Are the prospects of these latecomers' winning the licenses (if they were vacant) serious enough that they were truly harmed by the Commission's rejection of claims that might have led to nonrenewal and vacancy? See generally Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Yet, partly because the applicant petitioners' untimeliness foreclosed a Commission assessment of their qualifications, the question cannot be answered without guesswork. As petitioners' tardiness also entailed a failure to exhaust administrative remedies, however, we can resolve the case on non-constitutional grounds. See Coker v. Sullivan, 902 F.2d 84, 88 (D.C.Cir.1990) (dismissing case on non-constitutional jurisdictional grounds to avoid problematic Article III inquiry); Moore v. United States House of Representatives, 733 F.2d 946, 954 n. 39 (D.C.Cir.1984) ("[W]e should avoid deciding questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal quotes omitted). While the government did not specifically raise the exhaustion issue, the doctrine concerns economy not only of agency but also of judicial resources, see Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466-67, 45 L.Ed.2d 522 (1975), and accordingly this court may in its discretion raise the issue on its own. See, e.g., Dettmann v. United States Dep't of Justice, 802 F.2d 1472, 1476-77 & n. 8 (D.C.Cir.1986); Power Plant Division, Brown & Root, Inc. v. OSHRC, 673 F.2d 111 (5th Cir.1982); Brown v. Fauver, 819 F.2d 395, 398-99 (3d Cir.1987).
 
 
 7
 The judicial review provision of the Communications Act, 47 U.S.C. Sec. 402(b), authorizes disappointed "applicant[s]" and, more generally, "any ... person who is aggrieved or whose interests are adversely affected" by a Commission licensing order to sue for relief in this court. Yet even "aggrieved" persons must comply with prescribed administrative procedures. See Spanish International Broadcasting Co. v. FCC, 385 F.2d 615 (D.C.Cir.1967); Red River Broadcasting Co. v. FCC, 98 F.2d 282 (D.C.Cir.1938); see also Valley Telecasting Co. v. FCC, 336 F.2d 914 (D.C.Cir.1964); Springfield Television Broadcasting Corp. v. FCC, 328 F.2d 186 (D.C.Cir.1964). Indeed, Sec. 405 of the statute itself requires aggrieved persons who were not parties to the agency proceedings, as one prerequisite to judicial review, to petition the Commission for reconsideration of disputed orders.[2] In general, failure to exhaust administrative remedies bars judicial review of FCC orders.
 
 
 8
 Spanish International illustrates the exhaustion principle at work in the licensing context. International Panorama TV sought a license to construct a new television station. A competitor, Spanish International (apparently the same company as the beneficiary of today's ruling), twice submitted petitions attacking International Panorama's application, invoking the grounds it afterwards raised on appeal.[3] Because both petitions were untimely, the FCC refused to admit Spanish International as a party to the proceedings. After unsuccessfully petitioning for reconsideration under Sec. 405, Spanish International asked this court (1) to reverse the FCC's order denying it formal participation in the application proceedings and (2) to reverse the FCC's decision that International Panorama satisfied the Commission's character qualifications. See Appellant's Brief, Spanish Int'l Broadcasting Co. v. FCC, 385 F.2d 615 (D.C.Cir.1967).
 
 
 9
 The court affirmed the FCC's judgment that Spanish International's petitions were untimely and, accordingly, ruled that Spanish International had failed to exhaust the prescribed administrative remedies. 385 F.2d at 622-27. It then refused to consider Spanish International's substantive objections to the FCC's decision in favor of International Panorama. See id. at 627-28. "[E]xhaustion of administrative remedies," explained the court, "means utilization of the earliest available corrective step," and where a litigant " 'neglect[s] to avail itself of such an opportunity, it may thus have foreclosed itself from seeking further relief.' " Id. at 628, quoting Red River, 98 F.2d at 287-88.
 
 
 10
 As there, so here. An applicant for a broadcast license must file a timely application with the FCC before he may challenge an adverse Commission order in this court. This requirement promotes the values that the exhaustion doctrine was designed to protect: administrative and judicial economy and comity between courts and agencies. See generally McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969). The exhaustion requirement protects the FCC's interest in the finality of its adjudication and, as in this case, of settlements arising under its jurisdiction. Requiring applicants for broadcast licenses to file on time also permits the Commission to take an advance reading of the various claims and order its business efficiently from the beginning.
 
 
 11
 Moreover, as Judge Mikva wrote for this court in New York State Ophthalmological Society v. Bowen, 854 F.2d 1379, 1387 (D.C.Cir.1988), the exhaustion doctrine "promotes judicial efficiency ... by making possible a disposition by the agency that will obviate the need for a judicial decision on [an] issue." See also McKart, 395 U.S. at 195, 89 S.Ct. at 1663; Ticor Title Insurance Co. v. FTC, 814 F.2d 731, 741 (D.C. Cir.1987) (opinion of Edwards, J.). That principle is especially relevant here. If the applicant petitioners had filed timely applications, winning the licenses (their ultimate objective, assuming they would have spurned offers to join the settlement agreement) would have been only conditionally dependent on winning the legal dispute underlying this lawsuit (the alien ownership issue). They could have won the licenses without winning that dispute and, moreover, could have failed to qualify for those licenses without losing it. Either way, their timely participation at the administrative level could have mooted the issues fueling this litigation.
 
 
 12
 First, if HBS or the Partnership had timely pursued the proper administrative course, one of them might have prevailed in a comparative hearing and obtained the licenses without prevailing on the alien ownership issue (or, if even relevant under this scenario, the Jefferson Radio issue). Even if the FCC had ruled conclusively for Spanish International on the alien ownership issue, petitioners obviously could not have sued until after they had given their last administrative remedy--the comparative hearing--a shot, and we will not exempt them from that requirement now simply because they ignored the relevant application deadlines. And though it is difficult for a challenger to unseat an incumbent in a renewal proceeding, see generally Central Florida Enterprises, Inc. v. FCC, 683 F.2d 503, 506-08 (D.C.Cir.1982), "not even the probability of an administrative denial of relief will excuse the effort." See Spanish International, 385 F.2d at 626.[4]
 
 
 13
 Alternatively, if HBS and the Partnership had filed timely applications, the FCC might well have determined--quite apart from the issue of Spanish International's qualifications--that they were unqualified to operate broadcast stations. Indeed, the Commission pointed out in denying the belated applications that admitting petitioners to consideration "would require evidentiary hearings on [their] qualifications and on the standard comparative issue." See Joint Appendix 435; see also In re Belo Broadcasting Corp., 68 FCC 2d 1313 (1978); In re Edwin Berstein, 4 FCC Rec. 8420, 8421 (Rev.Bd.1989) (citing cases), aff'd 5 FCC Rec. 2843 (FCC 1990), aff'd mem. sub nom. Lefebvre v. FCC, 926 F.2d 1215 (D.C.Cir.1991). Whether an adverse decision on their basic qualifications would have stripped HBS and the Partnership of standing to appeal a renewal of Spanish International's license is an open question, turning in part on the seriousness and curability of the shortcomings in their applications. Compare Orange Park Florida T.V., Inc. v. FCC, 811 F.2d 664, 670-73 (D.C.Cir.1987), with Simmons v. FCC, 145 F.2d 578, 579 (D.C.Cir.1944). Even if such a determination had left their formal legal standing intact, it would have created a record exposing the weaknesses of their applications (thus filling the information vacuum that here prevents a firmly grounded finding of an Article III injury), and might have discouraged them from bringing their attack on Spanish International to court at all. The exhaustion doctrine thus permits us to avoid second-guessing agency decisions at the behest of litigants who have never been in a position to benefit from the decision they seek from us.
 
 
 14
 This is unlike the frequent case where compliance with an agency's procedures would not have caused the agency to venture down a path that could have mooted the issue brought to court. In such cases this court has often relaxed exhaustion requirements to permit consideration of issues that an agency has had a "fair opportunity" to address. See, e.g., United Church of Christ v. FCC, 911 F.2d 803, 808-09 (D.C.Cir.1990); United Church of Christ v. FCC, 779 F.2d 702, 706-07 (D.C.Cir.1985); Meredith Corp. v. FCC, 809 F.2d 863, 870 (D.C.Cir.1987); Marsh v. FCC, 436 F.2d 132, 136 (D.C.Cir.1970); Gerico Investment Co. v. FCC, 240 F.2d 410, 411-12 (D.C.Cir.1957); see also Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680-82 & n. 10 (D.C.Cir.1983); NRDC v. EPA, 824 F.2d 1146, 1150-51 (D.C.Cir.1987) (en banc). That approach makes sense. In such cases, there is little reason to think that a party's more thorough participation would have changed the agency's mind on those issues or otherwise precluded a lawsuit.[5] The unsurprising upshot of our decision here is simply that one who seeks to overturn a Commission licensing decision in the capacity of a disappointed applicant must actually apply, and must do so in timely fashion.
 
 
 15
 Jacksonville Broadcasting Corp. v. FCC, 348 F.2d 75, 79-80 (D.C.Cir.1965), and MG-TV Broadcasting Co. v. FCC, 408 F.2d 1257, 1265-66 (D.C.Cir.1968), insofar as they discussed exhaustion issues at all, did not explicitly address the precise problem at issue here. To the limited extent that the principles underlying either opinion conflict with our holding here, they are overruled.
 
 
 16
 Obviously nothing in our decision prevents any person who feels aggrieved from appealing an order denying him party status in the administrative proceedings; the panel decision (incorporated here) disposing of the untimely applications exemplifies the point. And if the agency's denial were in error, its denial of status would necessarily excuse later non-participation.[6]
 
 
 17
 One final note: HBS and the Partnership cannot excuse their tardiness on the grounds that they did not exist until after the prescribed filing period. Their principals existed and could have formed the firms earlier.
 
 The Viewers
 
 18
 Susan Jaramillo and the Coalition claim standing as viewers to challenge the FCC's approval of the renewal and transfer agreement. The Partnership also asserts viewer standing on the basis of the residence and viewing habits of its general partner. We dismiss these claims on prudential standing grounds. See generally Air Courier Conference of America v. American Postal Workers Union, AFL-CIO, --- U.S. ----, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991); Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Though viewers and listeners are among the intended beneficiaries of many Communications Act provisions, they are not the intended beneficiaries of Sec. 310(b), see Air Courier Conference of America, nor are they otherwise "suitable challengers" to enforce it, see Clarke, 479 U.S. at 399, 107 S.Ct. at 757; Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918, 922-24 (D.C.Cir.1989).
 
 
 19
 That section was designed to protect the entire nation--to "prevent[ ] alien activities against the Government during the time of war." Noe v. FCC, 260 F.2d 739, 741 (D.C.Cir.1958) (quoting 68 Cong.Rec. 3037 (1927) (remarks of Sen. Wheeler)). Committee hearings on the matter focused largely on keeping the airwaves available for military use in time of war, see Hearings on S.2910 Before the Senate Committee on Interstate Commerce, 73d Cong.2d Sess. 165-72 (March 15, 1934); see also S.Rep. No. 781, 73d Cong.2d Sess. 7 (1934), and only secondarily on the hazards of alien propaganda. Moreover, even if propaganda were a main concern, viewers seem an odd group to lead the enforcement, as genuine victims would by definition fail to notice the insidious effects. The viewers can only be suing as guardians of the national interest, but "[s]uch a generalized interest ... is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974).
 
 
 20
 Nor can viewers assert standing as intended beneficiaries of the Jefferson Radio doctrine, for it is entirely instrumental, aimed (in this context) only at enhancing the deterrent effect of whatever substantive provision supports the attack on the incumbent licensee, here Sec. 310(b)(3). See Stereo Broadcasters, Inc. v. FCC, 652 F.2d 1026, 1027 (D.C.Cir.1981). Because petitioners cannot sue to enforce Sec. 310(b), they cannot sue to enforce a means of enforcing Sec. 310(b).
 
 
 21
 * * *
 
 
 22
 We affirm the FCC order of June 5, 1987. We adhere to the panel opinion as it relates to petitioner TVL's claim and to the FCC's decision to reject petitioners' applications as untimely. We vacate the panel opinion as it relates to the standing of petitioners HBS and the Partnership and to the merits of their Jefferson Radio claim, and dismiss for want of exhaustion the claims that each rests on its status as a frustrated applicant. Finally, we dismiss for want of standing the claims of petitioners Coalition for Hispanic Broadcasting and Susan Jaramillo and the independent claim of the Partnership in its role of viewer.
 
 
 23
 So ordered.
 
 MIKVA, Chief Judge, dissenting:
 
 24
 Running headlong from the questions briefed and argued before us, my colleagues seek refuge in a theory as novel as it is questionable. Unsupported by precedent, undeveloped by the court, and unresponsive to the facts of this case, the stepchild of exhaustion theory announced today has an inauspicious birth. I doubt that this poor relation will thrive; therefore, I take issue with the majority primarily because particular parties have wrongly been denied their day in court. But recognizing the possibility that today's holding may be vivified by other judges on another day, I also write to express my view that it finds no precedent in the wholly sensible doctrine of administrative exhaustion and is, in fact, at odds with the goals underlying that requirement. Accordingly, I dissent.
 
 I.
 
 25
 We granted en banc review in this case to consider a single question: Whether petitioners have standing to challenge decisions by the Federal Communications Commission (the "FCC" or "Commission") allowing assignment of certain television station licenses to Hallmark Cards, Inc. ("Hallmark"). A technical and fact-specific issue to be sure, but one that this court deemed at the time to be of "exceptional importance." FED.R.APP.P. 35(a). See Appellee's Petition for Rehearing or Suggestion for Rehearing En Banc at 2 (filed Feb. 23, 1990) (seeking review of standing issue on grounds of importance).
 
 
 26
 Having heard the Commission's position on the standing issues of this case, I sympathize with the court's impulse to rest its holding on other grounds. Standing to appeal administrative decisions depends on a complex mix of statutory and constitutional conundrums, and is not simple to explicate. If, therefore, petitioners' claims had been totally meritless, this court might well have dismissed them without reaching the relatively difficult standing questions. See Coker v. Sullivan, 902 F.2d 84, 88 (D.C.Cir.1990); Adams v. Vance, 570 F.2d 950, 954 n. 7 (D.C.Cir.1978); Chinese Am. Civic Council v. Attorney Gen., 566 F.2d 321, 325 (D.C.Cir.1977). But I can see no justification for the majority's resort to grounds so unlikely that no party ever thought to brief or argue them, and so arcane that the court can find just one inapposite case (over a generation old) to cite as direct precedent. See Majority Opinion at 232 [hereinafter "Maj.Op."] (discussing Spanish Int'l Broadcasting Co. v. FCC, 385 F.2d 615 (D.C.Cir.1967)).
 
 
 27
 If it is dissatisfied with the parties' presentations to this court, the majority could--and should--have ordered supplemental briefing so that its judgment would be an informed one. If it is merely intent on avoiding the standing question upon which rehearing en banc was granted, the majority would have been well advised to dismiss this en banc petition as improvidently granted. But the majority chooses a different course, to which I now turn.
 
 II.
 
 28
 The court suggests that its approach will protect the finality of FCC proceedings and "promot[e] judicial efficiency," thereby furthering purposes traditionally associated with the exhaustion doctrine. Maj.Op. at 232-233. But these reasons can be invoked to justify any refusal to review agency action; whenever courts find challenges to administrative decisions nonjusticiable, they enhance the finality of agency determinations and lighten the judiciary's load. Accordingly, the court should adhere to its practice of asking whether dismissal of a case on exhaustion grounds would further "the primary purpose of the exhaustion doctrine": preventing premature interruption of the administrative process. Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90, 104 (D.C.Cir.1986). See Atlantic Richfield Co. v. Department of Energy, 769 F.2d 771, 781 (D.C.Cir.1984) (noting that avoidance of premature interruption is the "primary objective of the exhaustion doctrine," and stating that "[w]here ... the goals of this requirement cannot possibly be achieved, there obviously is no need for exhaustion"); Athlone Industries, Inc. v. Consumer Prod. Safety Comm'n, 707 F.2d 1485, 1488 (D.C.Cir.1983) ("The exhaustion doctrine was designed primarily to prevent premature interruption of the administrative process."); see also Committee for GI Rights v. Callaway, 518 F.2d 466, 474 (D.C.Cir.1975) ("[W]hen the reasons supporting the [exhaustion] doctrine are found inapplicable, the doctrine should not be blindly applied.").
 
 
 29
 The majority's decision to deny judicial review will not prevent "premature" interference with FCC proceedings for the simple reason that the petitioners raised each argument presented to this court before the Commission, and the Commission conclusively rejected every one. See Spanish Int'l Communications Corp., 2 FCC Rcd 3336 (1987) (rejecting competing applications and approving settlement agreement); Spanish Int'l Communications Corp., 2 FCC Rcd 3962 (Mass Media Bureau 1987) (approving assignment of television licenses), aff'd, 3 FCC Rcd 4319 (1988). This court has before it final administrative decisions, based on a record developed to the agency's satisfaction, and reflecting the Commission's unhampered exercise of discretion and application of expertise. See McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969). Applying the exhaustion doctrine to these facts stretches its underlying rationales beyond the breaking point.
 
 
 30
 My conviction that no prudential exhaustion doctrine bars assertion of jurisdiction over this petition for review finds unequivocal support in our cases interpreting the only exhaustion requirement that Congress saw fit to impose in the Communications Act. See 47 U.S.C. Sec. 405 (1988). Section 405 bars judicial review of Commission actions where:
 
 
 31
 the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.
 
 
 32
 Id. The majority concedes that section 405, as construed in our cases, does not bar review of petitioners' claims. See Maj.Op. at 231 n. 2. Yet it fails to mention that this court has repeatedly held that section 405 "codif[ies] the judicially-created doctrine of exhaustion of administrative remedies." Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 681 (D.C.Cir.1983)). See Office of Communication of United Church of Christ v. FCC, 911 F.2d 803, 808 (D.C.Cir.1990); Northwestern Ind. Tel. Co. v. FCC, 872 F.2d 465, 470 (D.C.Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990); Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153, 1163 (D.C.Cir.1987); Telecommunications Research and Action Center v. FCC, 801 F.2d 501, 513 n. 7 (D.C.Cir.1986), cert. denied, 482 U.S. 919, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987); Office of Communication of the United Church of Christ v. FCC, 779 F.2d 702, 706 (D.C.Cir.1985). Unless it is prepared to overrule this long line of authority, I am baffled how the majority can dismiss this case for failure to exhaust administrative remedies. If section 405 does not bar review, then the prudential exhaustion requirements that are incorporated within section 405 cannot provide a basis for dismissal of petitioners' claims.
 
 
 33
 Spanish Int'l Broadcasting Co. v. FCC, the 1967 decision so heavily relied upon by the majority, is not to the contrary. In that case, the Commission had summarily rejected petitions for administrative review and rehearing without addressing the merits of appellant's objections. See 385 F.2d at 619. (While the FCC did address the merits of administrative petitions submitted by Spanish International Broadcasting Company during 1964, it summarily rejected the appellant's relevant petitions, which challenged FCC decisions issued in November 1965 and March 1966. Spanish International makes no suggestion that the arguments presented in these distinct petitions overlapped. See 385 F.2d at 618-19.) Our cases interpreting section 405 establish that invocation of the exhaustion doctrine is warranted under circumstances like those in Spanish International, where the arguments of a non-party were not considered by the Commission. See United Church of Christ, 779 F.2d at 706-07; Washington Ass'n for Television & Children, 712 F.2d at 682. In this case, though, the Commission addressed petitioners' arguments in the challenged decisions, making application of the exhaustion doctrine inappropriate. Cf. United Church of Christ, 911 F.2d at 809 ("Because the Commission 'in fact considered the issue,' UCC's challenge ... may therefore be reviewed." (citation omitted)).
 
 
 34
 It is of course true that this case might never have come to court if the petitioners had acted differently years ago, long before the legal questions presented by this appeal arose. See Maj.Op. at 233. But I cannot agree with the majority that wishful speculation about what might have been justifies denying access to this court. Nor does the exhaustion requirement's futility exception, invoked by the majority, have any relevance to this case, see Maj.Op. at 233 & n. 4; because the exhaustion doctrine cannot reasonably be applied to the facts before us, reliance on cases interpreting one of its exceptions is insufficient to justify the majority's holding.
 
 
 35
 I find the court's approach particularly disquieting because Hispanic Broadcasting Limited Partnership ("HBLP") and Hispanic Broadcasting Systems, Inc. ("HBS") acted just as wise investors would--they spent time and money actively pursuing the licenses only at the point when a realistic chance of obtaining them arose. That a court sensitive to economic theory in other contexts should confuse rational economic behavior with a lack of genuine interest in obtaining the licenses only points up the majority's fervor to be done with this case. Cf. Tennessee Gas Pipeline Co. v. FERC, 926 F.2d 1206, 1210-11 (D.C.Cir.1991) (discussing "Efficient Market Hypothesis"); United States v. Western Elec. Co., 900 F.2d 283, 297-98 (D.C.Cir.) (per curiam) (noting judicial and academic views on interrelationship of antitrust laws and market behavior), cert. denied, --- U.S. ----, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990).
 
 
 36
 It is critical to remember that the television licenses which HBLP and HBS seek were not vacant during the years when, in the majority's view, HBLP and HBS should have pursued them. Rather, they were held by Spanish International Communications Corporation and Bahia de San Francisco (collectively, "Spanish International"), which were entitled under FCC rules to an all-but-insurmountable "renewal expectancy." See Central Florida Enterprises, Inc. v. FCC, 683 F.2d 503 (D.C.Cir.1982) (approving renewal expectancy policy), cert. denied, 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). The majority admits (with some understatement) that it is "difficult" to unseat an incumbent license-holder, Maj.Op. at 233, while the FCC stated during oral argument that its policy is "not to encourage" the filing of competing applications for licenses held by qualified licensees.
 
 
 37
 The prospects for those seeking Spanish International's licenses improved dramatically when the Commission, finding a "substantial question" whether Spanish International was under alien control, ordered that a hearing be held on the incumbent's qualifications as a license-holder. See Hearing Designation Order, 48 Fed.Reg. 28549 (1983). But the majority fails to mention that a long-standing Commission practice known as the "Jefferson Radio policy," as then in force, precluded transfer of Spanish International's licenses pending resolution of the qualifications issue. See Stereo Broadcasters, Inc. v. FCC, 652 F.2d 1026, 1027 (D.C.Cir.1981). Under Jefferson Radio, the very event that gave prospective applicants real hope of obtaining Spanish International's licenses--designation of a qualifications hearing--prevented HBLP and HBS from competing for those licenses. Their only option was to wait: If the Commission determined that Spanish International was qualified, it would again be foolish to challenge that incumbency; if unqualified, Spanish International would lose the licenses and HBS and HBLP could then compete on an equal footing with other applicants.
 
 
 38
 These reasonable expectations were upset, however, by an unforeseeable change in the well-established Jefferson Radio policy. The Commission decided to ratify the settlement agreement under which Spanish International would transfer its licenses to Hallmark, notwithstanding Jefferson Radio. See Spanish Int'l Communications Corp., 2 FCC Rcd 3962. In my view, approval of the settlement agreement and related license assignment constituted an impermissible departure from the Jefferson Radio policy. See Coalition for the Preservation of Hispanic Broadcasting v. FCC, 893 F.2d 1349, 1359-62 (D.C.Cir.1990) (per Mikva, J.). For present purposes, though, this court need only recognize that HBLP and HBS, relying on prior statements of that policy, had no reason to anticipate Commission approval of a license transfer during the pendency of proceedings on the qualifications issue. Surprised in this way, HBLP and HBS did the only thing they could, opposing the settlement at all levels while filing applications for the disputed licenses. See Petition of HBS to Deny Applications for Transfer of Control, filed Sept. 26, 1986, reproduced in Joint Appendix at 150 [hereinafter "J.A."], denied, Spanish Int'l Communications Corp., Mass Media Bureau No. 3713 (released June 23, 1987), reproduced in J.A. at 443; Petition of HBS for Acceptance of Applications, filed Sept. 26, 1986, denied, 2 FCC Rcd 3336; Petition of HBLP [then, Hispanic Broadcasting, Ltd.] for Reconsideration, filed Nov. 10, 1986, reproduced in J.A. at 345, dismissed, Spanish Int'l Communications Corp., 1 FCC Rcd 844 (Review Bd.1986); Petition of HBLP to Intervene or in the Alternative for a Waiver of the Rules, filed Nov. 10, 1986, reproduced in J.A. at 372, dismissed, 1 FCC Rcd 844, dismissed as moot, 2 FCC Rcd 3336; Petition of HBLP for Acceptance of Applications, filed Dec. 9, 1986, reproduced in J.A. at 405, denied, 2 FCC Rcd 3336; Application of HBLP for Review, filed Dec. 29, 1986, reproduced in J.A. at 505, denied, 3 FCC Rcd 4319.
 
 
 39
 Petitioners have no way of curing the shortcomings that the majority sees in their past efforts; that is just another aspect of the unfairness visited specifically upon them. More generally, though, the majority does not indicate what those who would challenge FCC licensing decisions must do to satisfy its retroactive "exhaustion" requirement. Must they seek every license up for renewal on the off chance that the incumbent licensee will be found unqualified, and that the license will be economically attractive at that hypothetical time? What are the implications of such a result for the Commission's established renewal procedures? Must prospective license-holders have applied for the license in question during the most recent filing window, or is any past filing sufficient? Must the FCC have recognized them as qualified to hold a broadcast license? How can they show their qualifications absent a comparative licensing proceeding? One can only speculate. It is clear, though, that the majority effectively requires parties with an interest in competing for vacant licenses to safeguard that interest by filing frivolous applications challenging incumbent license-holders.
 
 
 40
 If the majority thinks such waste of applicants' resources a trade-off for heightened administrative efficiency, it is misguided; today's decision may well increase the number of applications filed for licenses held by qualified incumbents, even though such applications are disfavored by the Commission and will have no real chance of success. Thus, invocation of exhaustion principles here will hinder the very administrative efficiency those principles were designed to advance. I doubt that this result is intended by the majority, but I am not surprised that nonsensical results will flow from a decision driven more by evasion than logic.
 
 
 41
 If, on the other hand, the court is motivated by a naked instinct to keep those who would challenge agency decisions out of court, my objection is more elemental. The record is clear that these petitioners acted reasonably in light of administrative precedents and the decisions of this court. Punishing sensible economic and legal decisions by withholding judicial review from firms that make them is, in my view, an unacceptable exercise of judicial discretion.
 
 III.
 
 42
 I do not overlook the majority's effort to narrow its opinion to the context of this case. See Maj.Op. at 234. But I cannot join with my colleagues on that basis alone. Rather, I believe today's decision unwise, unsound, and unfair. I dissent.
 
 
 
 [1]
 We also reject the claim of TVL Corporation for the reasons stated in the panel opinion, Coalition for the Preservation of Hispanic Broadcasting v. FCC, 893 F.2d 1349, 1355 (D.C.Cir.1990)
 
 
 [2]
 Although the applicant petitioners were not parties to the proceedings after denial of their untimely applications, their presentation to the Commission of the theories that they raise here, and the Commission's consideration of those theories, satisfies Sec. 405 under the cases summarized at pp. 233-234 below
 
 
 [3]
 Thus Spanish International met the condition that our cases sensibly impose for satisfying the exhaustion requirement of Sec. 405: the Commission had a fair opportunity to address the issues raised on appeal. See United Church of Christ v. FCC, 911 F.2d 803, 809 (D.C.Cir.1990) ("As we stated in Meredith Corp. v. FCC [809 F.2d 863, 870 (D.C.Cir.1987) ], '[a]s a condition precedent to judicial review, section 405 requires only that the Commission have a "fair opportunity" to pass on [an] issue.' "); see also cases cited at pp. 233-234 below
 The dissent's suggestion that the Commission did not address Spanish International's claims on the merits, see Dissent at 237, is therefore irrelevant. It is also false. The court observed that "because of their public importance, [the Commission] treated extensively the questions raised by [Spanish International]. It found that all of the points lacked merit save its claim respecting [International Panorama's] character qualifications, and this issue it designated for hearing." 385 F.2d at 618. As the opinion suggests and the record and briefs confirm, the Commission later rejected Spanish International's efforts to resurrect the same defeated attacks on International Panorama's qualifications. See id. at 619; Appellate Record at 992-97, 1016-19, Spanish Int'l Broadcasting Co. v. FCC, 385 F.2d 615 (D.C.Cir.1967). These attacks formed Spanish International's merits argument on appeal.
 
 
 [4]
 The dissent proposes that parties be permitted to sit out agency proceedings until the prospects of administrative relief pass a certain threshold (never identified) of financial promise. Dissent at 237-239. The dissent understandably does not identify a single case that supports such an extension of the exhaustion doctrine's futility exception. Apparently no court has yet felt it necessary to dilute the doctrine to that extent, presumably because no court shares the dissent's fear that the doctrine's application will generate "frivolous" administrative claims. See id. at 239
 
 
 [5]
 Contrary to the dissent's suggestion, see Dissent at 236-237, nothing we say undermines those of the above cases decided under 47 U.S.C. Sec. 405. In such cases, requiring exhaustion is often pointless; in ours, it is not. An agency's prior opportunity to consider the issues on appeal may be a necessary condition for judicial review, but it is not therefore a sufficient condition. Dicta that Sec. 405 "codif[ies]" the exhaustion doctrine, see Dissent at 236, can hardly wipe out Spanish International 's controlling treatment of the issue, which, to our knowledge, no case has ever criticized, much less purported to overrule. This leaves the dissent's criticism that Spanish International is "over a generation old", Dissent at 235, a curious ground for overruling a case
 
 
 [6]
 Cf. Shurberg Broadcasting of Hartford, Inc. v. FCC, 876 F.2d 902, 905 (D.C.Cir.1989) (Silberman, J.) (exhaustion not raised; applicant sought license but was rebuffed by the Commission), rev'd on other grounds sub nom. Metro Broadcasting, Inc. v. FCC, --- U.S. ----, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990)