**COLORADO–UTE ELECTRIC ASSOCIATION, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**International Brotherhood of Electrical Workers Local No. 111, Intervenor.**

**National Association of Manufacturers,**
Amicus Curiae.

No. 89–9545.

United States Court of Appeals, Tenth Circuit.

July 12, 1991.

Gerard C. Smetana, of Abramson & Fox, Chicago, Ill., and Michael E. Avakian, Center on Nat. Labor Policy, Inc., North Springfield, Va. (James H. Delman, Asst. General Counsel, Colorado–Ute Elec. Ass'n, Montrose, Colo., with them on the briefs), for petitioner-appellant.

Robert F. Mace, Attorney, N.L.R.B. (Barbara A. Atkin, Supervisory Atty., Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, with him on the brief), Washington, D.C., for respondent-appellee.

Marsha B. Berzon, San Francisco, Cal. (Joseph M. Goldhammer, of Brauer Buescher, Valentine, Goldhammer & Kelman, P.C., Denver, Colo., and James B. Coppess, Washington, D.C., with her on the brief), for intervenor-appellee.

Avrum M. Goldberg, P.C. and Patricia A. Casey, of Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., and Jan S. Amund-son, General Counsel and Quentin Riegel, Deputy General Counsel, Nat. Ass'n of Mfrs., Washington, D.C., filed a brief on behalf of Nat. Ass'n of Mfrs., as Amicus Curiae.

Before SEYMOUR, TACHA and BRORBY, Circuit Judges.

SEYMOUR, Circuit Judge.

The National Labor Relations Board (NLRB) held that Colorado–Ute Electric Association (Colorado–Ute or Company) violated section 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a) (1988), by unilaterally implementing a merit wage plan after impasse. Colorado–Ute appeals the Board's decision and the NLRB cross-appeals for enforcement of the order. We reverse the decision of the NLRB and decline to enforce it.

## I.

Colorado–Ute is an incorporated cooperative association which generates and sells electrical energy to member associations throughout Colorado, employing approximately seventy-two office and clerical workers. The International Brotherhood of Electrical Workers, Local No. 111 (Union) is the certified bargaining representative of Colorado–Ute's office, clerical, and plant workers.

The collective bargaining agreement relevant to this dispute, negotiated by the Union and Colorado–Ute, was effective from September 11, 1983 to September 13, 1986. Rec., vol. II, jt. ex. 1, at 29. It provided for hourly wage rates that increased according to an employee's tenure. An employee would receive a raise after a six-month term of employment and yearly thereafter. *Id.* at app. B. These automatic increases, or "progression steps," would continue until an employee's sixth year of employment. The collective bargaining agreement did not provide wage increases for the employees who had served more than six years with Colorado–Ute. Such employees, therefore, would "top out" of the pay scale at the seventh progression step. *Id.*

Article 32(d) of the collective bargaining agreement provided that during its term "either party may elect to negotiate wages in [the agreement] by giving written notice to the other party." *Id.* at 30–31. On June 8, 1984, the Union notified the Company in writing that it wished to open the wage progressions set out in Appendix B of the collective bargaining agreement to discuss a "lucrative wage increase for all classifications." Rec., vol. II, jt. ex. 2. Twenty-three bargaining sessions ensued, beginning on July 31, 1984 and terminating on March 27, 1985.

Marlene Joens and Don Shaputis, assistant and senior assistant business managers of the Union, and various unit employees including Joan Deskin Hiss, formerly a steward at Colorado–Ute's Craig facility, bargained on behalf of the Union. John Gibson, manager of personnel and labor relations, assisted by other management representatives, negotiated on behalf of Colorado–Ute. The bargaining history between the Union and Colorado–Ute is detailed below.[1]

### July 31, 1984

The Union began the first bargaining session by asking for a 9% across-the-board (ATB) wage increase for all job classifications in all pay grades. In the course of the first negotiating session, Gibson indicated that a wage increase was unacceptable because: Colorado–Ute already paid higher wage rates than other businesses in the area and consequently was under pressure not to grant further increases; the progression steps in the Union's contract already provided for guaranteed increases; Colorado–Ute wanted to develop a system of wage increases that would provide for those employees already at the maximum progression step; and there was "only so much money in the pot to spend." Rec., vol. IV, doc. 1, at 5; rec., vol. I, at 276–77. Gibson proposed combining a single wage rate for each job classification with a merit increase. The Union rejected the proposal. The Union stated

that the ATB wage increase was negotiable and further suggested that the parties could agree to freeze the current first and second 6–month hire-in rates. The meeting ended with no agreements having been made.

### August 14, 1984

Gibson continued to insist upon a merit increase program while the Union continued to propose an ATB wage increase. When the Union asked how the Company planned to implement its merit wage system without favoritism, Gibson did not respond. He replied only that the supervisor's opinion would be the basis for merit increases. The Union pushed for further details by emphasizing that a guarantee of fairness and no disparate treatment was required.

The Union made several of its own wage proposals. It suggested that the Company use "double jumping" to reward employees; that is, reward superior employees by promoting them through the progression steps at an accelerated rate as permitted by the current collective bargaining agreement. The Union next proposed either tying an ATB wage increase to the Company's profit margin or reducing the ATB wage increase to 7%. In conjunction with the 7% proposal, the Union also indicated that it would be willing to freeze hire-in rates. At various times the Union and the Company discussed the progression steps built into the collective bargaining agreement and the fact that they had been negotiated into the contract in previous years. The Company rejected the Union's proposals stating that they were too high and flawed because they were not based on merit.

### August 15, 1984

The Union again proposed a 7% ATB increase with a hire-in wage freeze. The Company rejected this proposal and suggested that the parties agree to eliminate

---

1. As noted by the Administrative Law Judge (ALJ), there is little factual dispute concerning the bargaining events as evidenced by the parties' bargaining notes submitted into the record. *See* rec., vol. IV, doc. 1, at 5 (ALJ decision); rec., vol. II, jt. exs. 49 & 50 (bargaining notes).

progression steps and implement a merit system. The Union indicated that it was opposed to merit increases in general but asked the Company to provide a specific proposal on wage terms.

After a lunch break, the Company handed out a proposal dated August 15. Rec., vol. II, Company Proposal, Aug. 15, 1984. The Company proposed to eliminate the progression steps in the current contract by establishing a fixed minimum, mid-point, and maximum wage rate for each job classification. The proposed minimum rate equalled the current second step rate (*i.e.*, second six-month rate) for each classification. The proposed maximum rate was equal to the top step of each classification with an added increase of 3.9%.[2] Additionally, all employees would receive 60% of their next step increase effective September 9, 1984. Thus, the Company's proposal specifically guaranteed, at a minimum, a higher hire-in rate and wage increase, effective September 9, 1984. It also increased the maximum wage rate employees could receive by 3.9%. In response to the Union's concerns that the merit system would be underfunded, the Company also offered to negotiate a "merit kitty," an amount set aside to be used for wage increases.

The proposal contained over a page of "Merit Increase Performance Guidelines" listing factors by which employees would be evaluated. The record reflects that Gibson stated these factors were only guidelines and that there would be no written merit evaluations. The proposal outlined non-binding guidelines establishing specific ranges for increases that corresponded to whether an employee had been evaluated "more than satisfactory", "satisfactory", and "less than satisfactory". The proposal outlined a schedule for frequency and amount and these were similarly non-binding. Gibson also stated that the frequency and amount of the increases, which were ultimately solely at the discretion of the employer, would also not be subject to the grievance procedure.

*August 16, 1984*

The bargaining session began with the Union rejecting the Company's August 15 wage proposal. The Union believed increases might not be granted under Colorado–Ute's proposal because there was no money budgeted for increases and because personality conflicts would arise between employees and supervisors who were determining wage merit increases. The Union also questioned to what extent wage increases were guaranteed beyond employees receiving 60% of their next step increase. The Union was specifically concerned with twenty-two of their employees who would be in the top step of their wage progression and would therefore be "at the mercy" of the proposed merit system for further wage increases. Rec., vol. I, at 43. It also feared that the proposal would hinder the grievance system because employees would be hesitant to file complaints against their supervisors who, under the proposed wage system, would be granting the increases. The Union also was concerned that each individual employee would ultimately end up negotiating his or her own wage increase.

Although Colorado–Ute's most recent proposal anticipated some specific terms, the Union continued to press for more specific details concerning the Company's proposal. The Union then offered its own proposal: a 6% ATB increase for all job classifications with a freeze on all hire-in rates at the current level. The Union added that if the Company chose to, it could evaluate the employees in six months, and those that were deserving could be granted an additional 3% increase.

The Company rejected the Union's proposal primarily because it attempted to lock in a set amount for a wage increase. In response to the Union's concerns, however, Gibson proposed a fixed amount for merit increases. Gibson specifically proposed that the Company take the dollar amount

---

**2.** The materials control clerk, the work order clerk, and the inventory control clerk were excluded from the proposed increase and were frozen at the current rate in the existing contract.

already committed to the merit increases for approximately the next year and distribute it among the employees by giving some to them immediately and distributing the rest among the employees through a merit system. This proposal would have had the effect of fixing the total amount of money to be spent on wages. No agreement was reached by the end of the negotiating session.

### August 20, 1984

The Company formally rejected the Union's proposal of a 6% ATB increase combined with the 3% merit increase. The Company also withdrew its previous suggestion to eliminate step increases entirely and made a new proposal: to leave the step increases intact and permit Colorado–Ute to pay merit increases in addition to the progression steps. The Company explained it favored this system because all employees were eligible for a merit increase in addition to their guaranteed progression step wage rate. It also stated no merit kitty would be established to implement this plan.

The Union proposed that the Company eliminate unproductive employees and then grant an ATB increase to remaining employees instead. The Union, however, opposed basing wages on merit because its employees preferred a guaranteed wage rate. The Company reiterated that it was not interested in putting a number on increases. The Company suggested another bargaining alternative was to leave wages unchanged, and the meeting adjourned without agreement.

When the parties resumed bargaining in the afternoon, the Company distributed a new written proposal of its merit increase program to the Union. Rec., vol. II, jt. ex. 7. The Company proposed to retain the existing progression steps for each job classification as guaranteed minimum wage rates. Under Colorado–Ute's plan, employees also would receive merit increases in addition to that minimum, subject to the discretion of the appropriate division head and the Company's president.

As noted by the ALJ, Colorado–Ute's president, Girt Krumins, testified that incorporating the progression steps for each job classification and eliminating supervisors' evaluations in determining merit wage increases reflected revisions to the Company's first merit proposal. Initially, the Company wanted to establish minimum and maximum wage rates for each classification with no progression steps but refined its proposal in order to respond to the Union's concern "that there was no guarantee that people would advance at all." Rec., vol. I, at 228. According to Krumins, Colorado–Ute "compromised substantially by proposing that the steps remain." *Id.* at 229. Colorado–Ute's proposal also eliminated the supervisor's evaluation as part of the merit plan, likewise in response to union concerns. "We recognized the concern ... of favoritism and the lack of overall fairness ... if supervisors were making these kinds of decisions. And that was a very ... good point that I believed very strongly that we had to change." *Id.; see also,* vol. IV, doc. 1, at 8 n. 9. The proposal also incorporated the Company's previous suggestion that the merit increases would not be subject to the contract grievance procedure. The Union rejected the Company's proposal because it provided only for merit increases and because it "offered less than" the last written proposal. The Union stated that it needed an ABT increase or an ABT increase in addition to a merit proposal from the Company.

### August 22, 1984

The session began with the parties insisting on their previous positions. The Union again proposed a combination of an ABT increase coupled with some form of fixed merit increases. The Company rejected the offer and Gibson asked if the parties were at an impasse. Shaputis replied on behalf of the Union that they were not.

In the afternoon bargaining session, the Company's president, Girt Krumins, participated. Krumins explained that due to economic pressure, the only way to increase wages was to increase productivity at the same time. Krumins asserted that the merit system was necessary to reward the

office and clerical employees above what one could receive for minimum contract performance. Krumins also pointed out that the Company was allowed to pay merit in addition to contract rates to the operations and maintenance employees under a separate agreement with those employees.

After Krumins spoke to the Union, the Company presented another written proposal. Rec., vol. II, at jt. ex. 8. The proposal offered to pay employees the existing contract's progression steps as minimum hourly rates effective September 9, 1984. In addition to the contract rate, the proposal offered merit increases which were to be determined solely by management and were to be approved by the Company's president. The merit increases would not be subject to the grievance procedure, although the proposed contract, or minimum, rates would be subject to the grievance procedure.

The Union rejected the Company's proposal, stating that it was no different from its proposal of August 15. The Union then suggested that a federal mediator be brought in. The Union denied that it was at an impasse with the Company, insisting that the Company had not compromised in any way. The Company pointed out that it was offering a minimum hourly wage with no locked-in maximum.

### August 29, 1984

Jerry Arnold, federal mediator, joined this negotiating session. The Union reported that it had met with its employees who had rejected the Company's proposal. The Union also reported that forty-nine employees had signed a petition showing their support for an ABT increase. The Union then proposed a 4% increase for all job classifications. The Company stated that it had a problem with increasing the structure and suggested as an alternative a flat pay-off combined with merit.

In the afternoon bargaining session, the Company made a specific proposal to pay those on the payroll as of September 8, 1984, a one-time cash payment of one hundred dollars and institute a merit increase system in addition to the one-time payment. The Company's proposal also stated that employees would receive at least two reviews within sixty days of implementing the new system, although there was no guarantee reviewed employees would receive an increase. The Union rejected the offer, noting that it amounted to only a .0066% ABT increase.

### August 30, 1984

The Union formally rejected the Company's August 29 proposal. The Union questioned the propriety of the proposal in the context of the wage reopener because it represented an attempt to change the wage structure, a subject of general contract negotiations. The Company rejected these contentions stating that because its proposal dealt with compensation it came within the "wages" reopener.

### September 5, 1984

The parties continued bargaining with the federal mediator. The Company formally rejected the Union's 4% ATB increase proposal. The Union then proposed to leave the current wage structure intact and grant a one-time payment of one-thousand dollars ($1,000.00) to each employee.

The Company called the Union's proposal "lousy" and rejected it. Rec., vol. I, at 73. It then presented the Union with what it called the "Final Company Offer." Rec., vol. II, jt. ex. 11. The final offer included the existing step increases, i.e., advancement based on established time intervals for each job classification, as a guaranteed contract minimum, subject to the grievance and arbitration procedure.[3] Rec., vol. I, at

---

3. Employees could discuss their merit wage increase with Colorado–Ute's president, Girt Krumins, although the merit increases could not be grieved. Rec., vol. I, at 88. Joan Hiss Deskin testified that she had discussed her merit increase with Krumins. *Id.* at 161–171. Deskin, a former union steward and negotiator testified

that, in her opinion, her discussion with Krumins did not constitute "negotiation" with respect to wages. Krumins discussed the range of merit increases, and the criteria for granting them, but he testified that he never discussed a future merit increase with any employee. *Id.* at 236–250.

75. The final offer also had a discretionary component, permitting the appropriate division head and president to make merit increases based on the criteria of individual performance and contribution to the job. The merit increases, however, would be within the fixed range of the progression steps. As evidenced by the final offer, Colorado–Ute continued to acquiesce in the Union demand for wage guarantees by leaving progression steps intact, and in its demand for a more impartial evaluation process by proposing that the Company president and appropriate division head make wage decisions. The amount and frequency of the merit increases would not be subject to the grievance procedure. The Company's "final offer", stated that if it were rejected, the Company "reserve[d] the right to 'impasse' its proposal." Rec., vol. II, at jt. ex. 11.

The Union counter-proposed a wage system consisting of an accelerated progression[4] with a 4% increase for all employees in the top step of their classification. Rec., vol. I, at 78. The Company rejected the Union's counterproposal.

### Implementation of Company's Final Offer

After the September 5 bargaining session, the unit employees rejected the Company's final offer by a vote. On September 12, Gibson wrote Joens that the Company believed the parties were at impasse. Gibson also notified Joens that he intended to implement the final offer on September 23.

On September 18, the unit employees began a strike against Colorado–Ute to protest the failure of the Company to agree to wage terms with the Union. On two occasions during the strike, September 20th and 24th, Gibson called the Union's "hot line."

The first message stated that the Union would make another wage offer to the Company to resolve the impasse and the second message reported that the Company had rejected the union's proposal for "resolving the impasse." Rec., vol. IV, doc. 1 at 11.

In the negotiating sessions on September 18 and 19, the Company continued to insist on its merits proposal of September 5, and its management prerogative to set the amount and timing of such increases. The Company also reasserted its intention to implement its merit proposal on September 23. The Union rejected the Company's merit proposal and on September 19 made its "final offer" to the Company of a 4% ATB increase.

On September 20, the Union offered a strike settlement by proposing one of three alternatives: (1) submit the Union and Company offers to an arbitrator with instructions to choose either proposal; (2) submit both proposals to an arbitrator to select a "fair and equitable" wage agreement; and (3) permit Krumins to meet with unit employees to explain the Company's wage offer and submit the proposal to unit employees for a binding, secret-ballot vote. Rec., vol. II, jt. ex. 17.

In a letter dated September 24, the Company stated that it had begun implementing its merit pay program and that it would "deliver the results of that implementation" to the Union at the next bargaining session. Rec., vol. II, jt. ex. 18.

On September 27 the federal mediator called another bargaining session. At this meeting Gibson gave the union the results of the merit increases the company had implemented as he had advised the union

---

In *Toledo Typographical Union No. 63 v. NLRB,* 907 F.2d 1220 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 767, 112 L.Ed.2d 786 (1991), the court denied enforcement to an NLRB order that permitted an employee to bargain to impasse over a clause that would have permitted the company to deal directly with its employees over retirement issues. The holding in the *Toledo Blade* does not apply to the instant case. The clause at issue here does not "entail

[the employer's] negotiating with its employees," whereas the clause in *Toledo Blade* "contemplate[d] direct negotiations between employer and employees." *Id.* at 1224.

4. Accelerated progression resembles merit pay to the extent that it gives the employer the right to move any employee upward through the progression steps as it deems fit rather than on a fixed schedule.

he would. *See id.; see also* rec., vol. I, at 85–86.[5]

### Post–Implementation Bargaining Sessions

The Union continued to insist on an ATB increase and to refuse to accept the Company's merit plan. Further negotiation of the merit component of the wage system was obstructed by the apparently irreconcilable positions of the Union and the Company.

In the course of further negotiations, the Union continued to insist that it should be consulted on the criteria for merit increases, and that employees have the right to grieve over their respective merit increases. The Company, on the other hand, reasserted its management prerogative to determine the amount and timing of merit increases and to permit individual questions or complaints to be directed to the Company president. After a meeting held March 27, 1985, negotiations ceased without agreement between the parties.

### Proceedings Below

Subsequent to the negotiations, the Union filed a complaint alleging that Colorado–Ute had violated section 8(a)(5) of the Act by failing to bargain in good faith with the Union, had engaged in surface bargaining, and had unlawfully implemented the terms of its wage offer during negotiations. *See* rec., vol. IV, doc. 1, at 1. The Union also alleged that the wage provisions implemented by Colorado–Ute exceeded the proposal it made, and that Colorado–Ute had engaged in direct dealing with an employee regarding wages. *Id.*[6]

A hearing was held, and the ALJ held that Colorado–Ute's insistence on its merit proposal did not amount to a failure to bargain in good faith. *Id.* at 26. The ALJ also found that the parties had reached a valid impasse when the Union rejected Colorado–Ute's proposal of September 5. *Id.* at 27. The ALJ concluded that upon reaching impasse Colorado–Ute was "free to unilaterally implement changes in employment terms and conditions" consistent with its final offer. *Id.* at 27. In accordance with the terms of that offer, the ALJ concluded that Colorado–Ute could determine the amount and frequency of merit reviews at its discretion: "Thus, no limitations were contained in Respondent's wage proposal regarding the number of times an employee could receive a merit review or the percentage of wage increase that could be granted." *Id.* at 29.

On appeal to the NLRB, the Union and the Board's General Counsel argued, *inter alia*, that Colorado–Ute had acted unilaterally in granting merit increases in violation of section 8(a)(5), in spite of the fact that the parties had reached a valid impasse, because the Company had never bargained over the "specific terms" of the merit increases, *i.e.*, the actual timing and amount of individual increases. They contended that through its final merit wage proposal, Colorado–Ute in effect demanded a "waiver" from the Union of its statutory right to bargain over the timing and amounts of employee wage increases, a waiver the Union never gave. The NLRB agreed. In its opinion, it stated that "[t]he implementation of a merit pay program, to the extent that implementation involves discretion in determining the amounts or timing of the increases, is a matter as to which the bargaining agent is entitled to be consulted." Rec., vol. IV, doc. 8, at 6. It therefore concluded that, in proposing to exclude the Union from negotiation over the timing and amount of such increases, Colorado–Ute's wage proposal, which retained total management discretion, effectively constituted a waiver of the Union's right to bargain over wage terms. Accordingly, the NLRB held that Colorado–Ute could not implement its offer final at impasse. "Where an employer proposal seeks the union's waiver of statutory rights, ... impasse is no substitute for consent." *Id.* at 9.

The NLRB further declared:

---

5. Merit increases were also awarded during post-impasse negotiations, the results of which were forwarded to the Union.

6. In charges not appealed to this court, the Union's initial complaint also charged certain violations of 29 U.S.C. § 158(a)(1) by Colorado–Ute.

"Having failed to secure a waiver of the Union's statutory right to bargain over the merit increases' timing and amounts, the Respondent was not free to grant increases without consulting with the Union about these matters. The Respondent never did so. Instead, it presented the Union with the results of its merit reviews after increases had already been granted. Further, when the Union was shown the first set of merit increases in September 1984, it inquired whether the Respondent would negotiate over the increases, and whether the Union could approach the Respondent on an employee's behalf if the employee was dissatisfied with a merit increase. In both instances, the Respondent answered no. We conclude that the Respondent's failure and refusal to bargain with the Union over the timing and amounts of merit increases violated Section 8(a)(5) of the Act."

*Id.* at 10.

Notwithstanding its conclusion that Colorado–Ute could not implement its final offer at impasse, the NLRB agreed with the ALJ that Colorado–Ute had bargained in good faith and that the parties has reached a legitimate impasse. The NLRB also concluded that merit increases were a subject of mandatory bargaining. Therefore, the order reflected the NLRB's opinion that circumstances in the instant case presented an exception to the rule that "if the parties reach good-faith impasse in negotiations, the employer generally does not violate section 8(a)(5) by thereafter implementing changes with those consistent with those proposed to the union." *Id.* at 8.

## II.

### Standard of Review

■ Enforcement of an NLRB order is granted when the NLRB has correctly applied the law and its findings are supported by substantial evidence in the record as a whole. *Glaziers Local Union 558 v. NLRB*, 787 F.2d 1406, 1411 (10th Cir.1986). In reviewing the NLRB's interpretation of the NLRA, we recognize that "Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979); *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987) (the NLRB has "considerable authority to interpret provisions of the NLRA"). Nonetheless, the judgment of the NLRB is subject to judicial review. Enforcement of its orders may be denied where its judgment has no reasonable basis in the law; its interpretation is fundamentally inconsistent with the NLRA and an attempt to usurp " 'major policy decisions properly made by Congress;' " and where the Board has moved " 'into a new area of regulation which Congress has not committed to it.' " *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849 (citations omitted).

### Statutory Right to Bargain

■ Under section 8(a)(5) of the NLRA, employers commit an unfair labor practice by "refus[ing] to bargain collectively with the representatives of [their] employees." 29 U.S.C. § 158(a)(5). Section 8(d) defines the obligation to bargain collectively as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other term and conditions of employment." *Id.* § 158(d). The Act, therefore, requires the employer to bargain collectively regarding wages. It is well established that merit wages are encompassed within this statutory language and are a mandatory subject of bargaining. *NLRB v. Katz*, 369 U.S. 736, 745, 82 S.Ct. 1107, 1112, 8 L.Ed.2d 230 (1962); *see also, NLRB v. J.H. Allison & Co.*, 165 F.2d 766, 768 (6th Cir.), *cert. denied*, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).

■ Our inquiry begins by determining the scope of the duty to bargain with respect to merit increases. The Union and the Board contend that the Union has a statutory right to bargain over the timing and amount of wages. They argue, there-

fore, that proposing and bargaining for merit wages, wherein the frequency and amounts of such wages are subject to the employer's discretion, does not vindicate that right, and that such merit increases cannot be implemented upon impasse. It is the Board's position that an explicit waiver by the Union of its right to bargain is thus required. The Board also contends that the duty to bargain imposed by sections 8(a)(5) and 8(d) encompasses an obligation to "bargain about *particular* economic terms." NLRB Brief at 27 (emphasis added).

> "[T]he Company was free to satisfy its bargaining obligation by making a proposal that would permit the Union to engage in meaningful bargaining at the outset over the timing and amounts of the merit wage increases. If the parties then reached impasse over timing and amounts, the Company would be free to implement its merit increases without further negotiations. The choice was the Company's: either to bargain with the Union about the economic terms at the outset or to seek a waiver of the Union's statutory right to bargain and, if unsuccessful, to bargain about those terms prior to implementation."

*Id.* at 27–28. We disagree with the Board's contention and conclude that, given the bargaining history in this case, the Union's statutory right to bargain was vindicated by hard bargaining over merit wage proposals.

Precedent does not support the Board's position that the Union's right to bargain can be vindicated only by discussing the economic terms of particular merit increases, rather than a general proposal that the employer be permitted to exercise discretion with respect to merit wage programs. In its decision, the NLRB relied on *Onieta Knitting Mills, Inc.*, 205 N.L.R.B. 500, 500 n. 1 (1973), as support for the proposition that although at least eleven bargaining sessions preceded implementation of Colorado–Ute's wage plan, the Union's statutory right to bargain over wages had not been vindicated, and that further negotiation regarding the timing and amount of specific merit increases was required prior

to implementation despite impasse. *See* rec., vol. I, doc. 8, at 6. However, the facts in *Onieta Knitting Mills* are wholly distinguishable from those here. In that case, the employer attempted to implement discretionary merit increases according to its "established" past practice. The employer granted the increases without notice or consultation with the union, which had been certified approximately one month earlier. The NLRB concluded that while an employer may ordinarily pursue past wage practices without consulting the union, this rule did not apply in those instances where discretion would be exercised.

> "Respondent argues that a finding that the unilateral grant of merit increases was a violation of Sec. 8(a)(5) would be inconsistent with the holding of this Board in *Southeastern Michigan Gas Company*, 198 N.L.R.B. No. 8, wherein we found a discontinuance of merit increases to have been a violation of Sec. 8(a)5. We disagree. An employer with a past history of a merit increase program neither may discontinue that program (as we found in *Southeastern Michigan*) nor may he any longer continue to unilaterally exercise his discretion with respect to such increases, once an exclusive bargaining agent is selected. *N.L.R.B. v. Katz*, 396 [369] U.S. 736 [82 S.Ct. 1107, 8 L.Ed.2d 230] (1962). What is required is a maintenance of preexisting practices, i.e., the general outline of the program, however the implementation of that program (to the extent that discretion has existed in determining the amounts or timing of the increases) becomes a matter as to which the bargaining agent is entitled to be consulted."

*Onieta Knitting Mills*, 205 N.L.R.B. at 500 n. 1. The remaining cases cited in support of the NLRB's holding are similarly inapposite. *See N.L.R.B. v. Blevins Popcorn Co.*, 659 F.2d 1173 (D.C.Cir.1981); *Advertiser's Mfg. Co.*, 280 NLRB 1185, 1195–96 (1986), *enforced*, 823 F.2d 1086 (7th Cir.1987); *Gerkin Co.*, 279 N.L.R.B. 1012 (1986); *Koenig Iron Works, Inc.*, 276 N.L.R.B. 811 (1985); *State Bank of India*, 273 N.L.R.B. 267 (1984), *enforced*, 808 F.2d 526 (7th Cir.

1986); *Plymouth Locomotive Works, Inc.,* 261 N.L.R.B. 595 (1982). That an employer may not grant discretionary, as opposed to fixed, wage increases under the past-practices doctrine in no way answers the question whether an employer who has bargained extensively over the right to grant discretionary merit increases may do so after reaching impasse on that very issue.

Equally distinguishable is *Katz,* 369 U.S. at 741, 82 S.Ct. at 1110, in which the employer implemented merit increases during negotiations and prior to any impasse, contending the increases were justified on the bases of preserving the status quo in line with established past practices. The Court said:

> "Whatever might be the case as to so-called 'merit raises' which are in fact simply automatic increases to which the employer has already committed himself, the raises here in question were in no sense automatic, but were informed by a large measure of discretion. There simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice, and therefore the union may properly insist that the company negotiate as to the procedures and criteria for determining such increases."

*Id.* at 746–47, 82 S.Ct. at 1113 (emphasis added). We find *Katz* unhelpful here because no impasse was reached in that case.

None of the cases relied on by the Board stand for the proposition that in order to vindicate a union's right to bargain over wages, "particular" economic terms must be presented to the union during bargaining or prior to implementation upon impasse where the company is negotiating for discretionary management rights with respect to wage terms. To the contrary, *Onieta Knitting Mills* and similar NLRB rulings arose primarily in situations where the company had failed to negotiate *at all,* or had attempted to implement discretionary wage increases according to purported "established past practice." These cases do not address the crucial question at issue in this case, which is *how* must these issues be negotiated in order to vindicate the Union's right to bargain. Furthermore, as explained by the Supreme Court, "negotiation over the procedures" governing merit increases is most compelling where the union needs "to know whether or not there has been a substantial departure from past practice." *Katz,* 369 U.S. at 746, 82 S.Ct. at 1113. This rationale is not applicable to the facts of this case. Moreover, none of the Board's cases involved an impasse, an omission we view as critical.[7]

We conclude that the weight of authority supports Colorado–Ute's construction of the NLRA. In *NLRB v. American Nat'l Ins. Co.,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), the Supreme Court rejected the NLRB's holding that bargaining for a strong management-rights clause, in which the employer "reserve[d] to itself the right to take unilateral action with respect to rates of pay, wages, hours of employment," *id.* at 400 n. 5, 72 S.Ct. at 827 n. 5, was an indicia of bad faith bargaining or a *per se* violation of the Act itself. In so doing, the Court rejected the Board's "position that employers subject to the Act must agree to include in any labor agreement *provisions establishing fixed standards for work schedules or any other conditions of employment." Id.* at 408, 72 S.Ct. at 831 (emphasis added). The Court held that the employer had satisfied its duty to bargain by negotiating over the terms of the management-rights clause. In so doing, the Court rejected the view of the dissent that negotiating for a broad management-rights clause represents an

7. In *Koenig Iron Works, Inc.,* 276 N.L.R.B. 811 (1985), the NLRB specifically held that there was no impasse, and distinguished the facts in *Koenig* from an impasse situation.

> "An employer violates his duty to bargain if, when negotiations are sought or are in progress, he unilaterally institutes changes in existing terms and conditions of employment. On the other hand, after bargaining to an impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals.

*Id.* at 814 (quoting *Taft Broadcasting Co.,* 103 NLRB 475 (1967)).

attempt to "stake out an area which is a proper subject for bargaining and [to] say, 'as to this we will not bargain.'" *Id.* at 413, 72 S.Ct. at 834 (Minton, J. dissenting). This decision casts considerable doubt on the position that specific terms must be presented to the Union prior to implementation upon impasse.

The Supreme Court also implicitly rejected the Board's theory in the instant case that bargaining only for a broad management-rights clause necessarily undermines a union's right to bargain.

"Any fears the Board may entertain that use of management functions clauses will lead to evasion of an employer's duty to bargain collectively as to 'rates of pay, wages, hours and conditions of employment' do not justify condemning all bargaining for management functions clauses covering any 'condition of employment' as *per se* violations of the Act." *Id.* at 409, 72 S.Ct. at 832. *American Nat'l* similarly rejects the Board's position that instituting discretionary wage terms necessarily abrogates, or even diminishes, a union's right to bargain. To the contrary, by vigorously bargaining over how a discretionary wage clause would be implemented, an employer *vindicates* the union's right to bargain.

In this case, as is apparent from our recitation of the facts, the parties bargained vigorously over the subject of wage increases and the methodology by which merit increases would be granted. Colorado–Ute initially proposed a single wage rate for each job classification with a merit increase, but throughout negotiations that proposal changed and took on more definite contours. There was also considerable negotiation and movement on the part of Colorado–Ute as to how wages would be fixed. Prior to implementation of its final proposal, the Company suggested various methodologies for arriving at the amount of increases. Several of these contemplated fixed economic terms the Union now argues it was entitled to be presented with during bargaining or prior to implementation, such as: setting a single rate with a merit increase component; eliminating pro-

gression steps, and implementing a merit system; guaranteeing minimum, midpoint, and maximum wage rates for each job classification; fixing the amount of increases by tying them to those amounts that would otherwise be distributed by the step increase system; and leaving the step increases in place and paying additional merit increases. Colorado–Ute initially contemplated instituting merit increases on the basis of the supervisor's opinion. Subject to further bargaining, however, it agreed to award merit increases on the basis of an evaluation by the appropriate division head and the Company's president.

Further, the merit increases proposed by Colorado–Ute limited the employer's discretion to the extent that they were linked to the identifiable criteria of job performance and contribution on the job. While the discretionary component of wage increases, *i.e.,* that based on merit, was not subject to the grievance procedure, the individual employees could grieve the failure to receive the minimum rate of their progression step rate. The Company proposal initially permitted employees to meet with Krumins, the Company president, if they felt they had been treated unfairly. In negotiations subsequent to impasse, Colorado–Ute likewise proposed to allow individual employees to request a meeting with Krumins, also attended by a union representative, to discuss their merit increases. Rec., vol. IV, doc. 1, at 15.

Similarly, other post-impasse negotiations demonstrated a continued willingness on the part of Colorado–Ute to discuss the methodology for implementing merit increases. These negotiations covered, for example, such topics as performance standards, *id.* at 14, subjecting the timing of merit increases to the contract grievance procedure, *id.* at 17, and the possibility of receiving union input into the criteria underlying merit increases, rec., vol. I, at 329.

### Right to Implement At Impasse

■ The NLRB erred by trying to safeguard the right to bargain by limiting the employer's right to implement its final offer based on the substantive content of its

1404

wage proposal. As acknowledged by the NLRB in its opinion, the general rule is that an employer has the right upon impasse to implement its final offer with respect to a mandatory subject of bargaining such as wages.

"Section 8(a)(5) of the Act requires that an employer bargain with the union before effecting changes in terms and conditions of employment. *But if the parties reach good-faith impasse in negotiations, the employer generally does not violate Section 8(a)(5) by thereafter implementing changes consistent with those proposed to the union. Taft Broadcasting Co., 163 N.L.R.B. 475 (1967), enfd. sub. nom. Television Artists AFTRA v. N.L.R.B., 295 F.2d 622 (D.C.Cir.1968). That the employer is free to implement changes after reaching good-faith impasse is another way of expressing the axiom that the employer's duty to bargain over proposed changes does not imply a duty to agree to the union's counterproposals or to make a concession. See Section 8(d) of the Act. The employer's duty to bargain does not give the union a right to veto the proposed changes by withholding consent.* If the parties have bargained to good-faith impasse and the union has been unable to secure concessions or agreement to its proposals, then the employer may proceed to implement the changes it proposed to the union in negotiations."

Rec., vol. IV, doc. 8, at 8–9.

■ In the context of wage negotiations, therefore, while an employer cannot use its economic power to remove a subject completely from the bargaining table, it is not compelled to agree to the union's wage terms. That being the case, the union does not enjoy a unilateral veto over wage terms, and the employer may try to achieve the wage terms it desires by using its economic weapon of implementing at impasse. *See Katz,* 369 U.S. at 745 & n. 12, 82 S.Ct. at 1113 & n. 12; *Newspaper Printing Corp. v. NLRB,* 625 F.2d 956, 966 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101

S.Ct. 1349, 67 L.Ed.2d 335 (1981). Consistent with the Act, this right exists irrespective of the parties' bargaining positions. *See American Nat'l Ins. Co.,* 343 U.S. at 401–02, 72 S.Ct. at 828. To hold otherwise would conflict with the well-established proposition that the NLRB cannot exert its power to dictate the substantive terms of the collective bargaining agreement. *See H.K. Porter Co., Inc. v. NLRB,* 397 U.S. 99, 103–04, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970); *American Nat'l Ins. Co.,* 343 U.S. at 401–02, 72 S.Ct. at 828 ("The theory of the Act is that the making of voluntary labor agreement is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively."); *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 488, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960).

■ In this case, it is undisputed that the parties were at impasse. Nonetheless, the NLRB concluded that because of the wage terms Colorado–Ute proposed, it could not "proceed with implementation of [its] final offer." Rec., vol. IV, doc. 8, at 8. This conclusion is fundamentally at odds with the NLRB's own statement of the law with respect to mandatory subjects of bargaining; specifically, the rule that an employer can implement its final offer at impasse. The NLRB attempts to reconcile its order with its own competing statement of the law concerning implementation at impasse by stating that Colorado–Ute's proposal is tantamount to a waiver of the Union's bargaining power. As discussed above, however, such a clause is not a *per se* violation of the NLRA, nor does it undermine the Union's right to bargain; therefore, we do not believe it constitutes a waiver. By holding the final offer was a "waiver" of the Union's right to bargain, and that it could not be implemented without further consultation with the Union, the NLRB eviscerated Colorado–Ute's right to implement at impasse, one of its powerful economic tools for achieving its wage terms, even though these terms were law-

ful ones.[8] In effect, the Board's decision gave the "union a right to veto the proposed changes by withholding consent," *id.* at 8–9, in contravention of the rule of implementation at impasse. The NLRB's decision, therefore, infringes on the employer's right to bargain for and implement an admittedly lawful wage proposal.

We conclude that, consistent with the NLRA, the NLRB should have used good faith bargaining requirements as a statutory check in this case. "The duty to bargain collectively is to be enforced by the application of the good faith bargaining standards of Section 8(d). . . ." *American Nat'l Ins.*, 343 U.S. at 409, 72 S.Ct. at 832. Good faith bargaining requirements ensure that an employer will not simply "go through the motions" of discussing wage proposals and then take unilateral action by implementing its own terms. *See* 29 U.S.C. § 158(d); *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). These requirements thus ensure that an employer will not achieve its discretionary wage terms in bad faith.

In arguing its case, the Board condemns Colorado–Ute for maintaining a "rigid position throughout negotiations" and "steadfastly refus[ing] to consider any union proposal for involvement in deciding the timing and amounts of the increases." *Board Brief* at 13. While such rigidity could potentially be the basis for a finding of bad faith, the ALJ concluded in this case that based on the totality circumstances Colorado–Ute had negotiated in good faith as it had "engaged in hard bargaining and adhered to a legitimately held position during the wage-reopener negotiations." Rec., vol. 1, doc. 1 at 23. The NLRB affirmed this judgment, stating explicitly that Colorado–Ute "did not fail or refuse to bargain in good faith by insisting on its merit wage proposal." Rec., vol. IV, doc. 8, at 8, & n. 5. While an employer's proposal may be the basis of a finding of bad faith, *see N.L.R.B. v. Wright Motors*, 603 F.2d 604,

609–610 (7th Cir.1979), that was clearly not the case here.

### III.

Because the Board erred in construing the scope of the duty to bargain and attempted to protect the Union's right to bargain by regulating the substantive terms of the wage proposal rather than applying good-faith bargaining requirements, its decision is "fundamentally inconsistent with the act," which contemplates the legality of broad management-rights clauses and the protection of the right to bargain through the application of good-faith bargaining standards. *See Ford Motor Co.*, 441 U.S. at 497–98, 99 S.Ct. at 1849.

We REVERSE the decision of the NLRB and deny enforcement of its order.

striking, as the Union did in this case.

---

**8.** We also note that a union can exert economic pressure to achieve the wage terms it desires by