United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 16, 1997 Decided December 19, 1997 

 No. 96-1399

 McClatchy Newspapers, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 Northern California Newspaper Guild, Local 52, 

 Intervenor

 Consolidated with 

 No. 97-1111

 On Petitions for Review and Cross-Applications

 for Enforcement of Orders of the

 National Labor Relations Board

 Jeremy P. Sherman argued the cause and filed the briefs 
for petitioner.


 David S. Habenstreit, Supervisory Attorney, National La-
bor Relations Board, argued the cause for respondent, with 
whom Linda R. Sher, Associate General Counsel, and Aileen 
A. Armstrong, Deputy Associate General Counsel, were on 
the brief.

 James B. Coppess argued the cause for intervenor North-
ern California Newspaper Guild, Local 52, with whom Bar-
bara Camens, Marsha S. Berzon, and Laurence S. Gold were 
on the brief.

 Gerard C. Smetana was on the brief for amicus curiae 
Council on Labor Law Equality.

 Before: Silberman, Rogers, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: This dispute encompasses two 
cases, one involving McClatchy's Sacramento newspaper and 
the other its Modesto newspaper. In both cases, the National 
Labor Relations Board found that McClatchy committed an 
unfair labor practice by unilaterally implementing a discre-
tionary merit pay proposal, even though McClatchy had 
bargained to impasse over the proposal with the union. In 
the Modesto case, the Board also found that McClatchy had 
threatened its employees with discharge for engaging in a 
protected activity. McClatchy petitions for review of the 
orders, and the Board cross-petitions for enforcement. We 
enforce the Board's Sacramento order, and partially enforce 
the Board's Modesto order.

 I.

 At the Sacramento Bee, the Northern California Newspa-
per Guild, Local 52 represents editorial, advertising, and 
telephone switchboard employees. McClatchy's most recent 
collective bargaining agreement with the union, which expired 
in 1986, set pay through a combination of wage scales and 
discretionary merit raises. The agreement defined 28 job 


classifications, each setting a minimum salary that automati-
cally increased with each year of experience. Once an em-
ployee reached the maximum salary for his or her classifica-
tion, raises were based solely on merit, as determined by the 
company. McClatchy retained full discretion over the timing 
and amount of these merit raises, and its decisions were 
excluded from the contractual grievance and arbitration pro-
cedure. Within 10 days of performing a merit evaluation, 
McClatchy would notify the union of the result, and the union 
then could make nonbinding comments and participate in the 
appeals process at the employee's request.

 When the 1986 agreement expired, McClatchy and the 
union each proposed a new wage system. From the outset, 
their proposals were diametrically opposed: McClatchy want-
ed to move to a system based entirely on its determination of 
merit; the union wanted to eliminate the merit system alto-
gether. McClatchy's final offer proposed to grandfather cur-
rent employees earning less than their classification's maxi-
mum, but this plan only superficially preserved the old wage 
scales. Ninety percent of the employees were already at the 
top salary step in their class, so the offer kept most raises in 
McClatchy's complete discretion. And, since the 1986 scales 
were out of step with the cost of living, salaries for the 
remaining 10% would effectively be determined by the pub-
lisher's discretion as well.

 The parties bargained in good faith, but ultimately dead-
locked over wage terms for the new agreement. Following 
impasse, McClatchy asserted that it was implementing its 
final offer and began granting increases to employees without 
consulting the union. Under the terms of McClatchy's pro-
posal--as was true under the 1986 agreement--the union's 
role was restricted to making nonbinding comments and 
participating in the appeal process only if asked by the 
employee. The union filed an unfair labor practice charge 
against McClatchy, alleging that implementing "merit" in-
creases without the union's consent violated McClatchy's duty 
to bargain with the union over wages.


 Before the Board resolved the union's Sacramento com-
plaint, petitioner reached an impasse with the union over a 
similar discretionary pay proposal for its Modesto Bee edito-
rial staff. The only difference in the Modesto proposal was 
that it fixed the timing of merit increases. At the Sacramen-
to Bee, McClatchy could consider employees for increases as 
frequently or infrequently as it wished, but at the Modesto 
Bee, increases were tied to the annual review process. As it 
had in Sacramento, petitioner implemented its final offer 
after impasse and gave raises to some employees. The union 
filed a second unfair labor practice charge against McClatchy, 
and included an allegation that McClatchy had threatened the 
Modesto employees with discharge for engaging in protected 
activity. Petitioner had posted a copy of its final offer, with a 
cover memorandum noting that, in the absence of agreement, 
the final offer set the terms and conditions of employment. 
Because the posted offer included a no-strike/no-picketing 
clause, the union complained that the posting was a veiled 
threat to employees.

 The Board considered the Sacramento case first. The 
General Counsel argued that because McClatchy had a statu-
tory obligation to bargain over "wages, hours, and terms of 
employment," granting individual raises without consulting 
the union violated the National Labor Relations Act. 
McClatchy maintained that it had satisfied that duty by 
bargaining to impasse over the discretionary pay proposal. 
Once it had exhausted the bargaining process by reaching 
impasse, McClatchy asserted, it was privileged to implement 
its "last, best, and final offer" over the union's objection. 
Relying on its decision in Colorado-Ute Electric Association, 
295 N.L.R.B. No. 67 (1989), enf. denied, 939 F.2d 1392 (10th 
Cir. 1991), the Board rejected McClatchy's defense. In the 
Board's view, this case was less about impasse than statutory 
waiver: an employer who proposes unlimited management 
discretion over wages is really proposing that the union waive 
its statutory right to be consulted about wage changes. That 
is fine, the Board reasoned--if the union agrees. But im-
passe, by definition a lack of agreement, could not substitute 


for consent. Without a waiver, nothing relieved McClatchy of 
its obligation to bargain with the union before changing any 
employee's pay; unilaterally granting merit increases, there-
fore, was an unfair labor practice. McClatchy Newspapers, 
Inc., Publisher of The Sacramento Bee, 299 N.L.R.B. No. 156 
(1990).

 The Board petitioned for enforcement of its order. The 
majority of the court, in a per curiam opinion, held that the 
Board's decision did not constitute reasoned decisionmaking. 
NLRB v. McClatchy Newspapers, Inc., 964 F.2d 1153 (D.C. 
Cir. 1992). The three judges wrote separate opinions, howev-
er, each expressing a somewhat different view of the Board's 
approach. Judge Henderson essentially agreed with the 
Tenth Circuit's view, expressed in Colorado-Ute, that the 
Board simply could not square its approach with governing 
precedent under the NLRA. Judge Silberman thought that 
the issue the Board faced was novel and that the Board's 
waiver theory might well be a legitimate interpretation of the 
Act if adequately explained. Chief Judge Edwards believed 
that the Board's waiver theory would not work, but that it 
might be possible to articulate a limited exception to the 
impasse doctrine that would cover this situation. He pointed 
out that the employer's bypassing the union in setting wage 
rates could be seen as a kind of de-collectivization of bargain-
ing. Id. at 1173. Chief Judge Edwards and Judge Silberman 
agreed to remand to the Board for further consideration; 
Judge Henderson would have simply denied enforcement.

 On remand, although it still used some language redolent of 
its original waiver theory,1 the Board essentially adopted 
Chief Judge Edwards' suggestion and fashioned an exception 
to the implementation after impasse doctrine. The Board 
explained that although the doctrine "is designed, in part, to 

__________
 1 "In sum, it is not the Respondent's bargaining proposal that 
we view as inimical to the policies of the Act, but its exclusion of the 
Guild at the point of its implementation of the merit pay plan from 
any meaningful bargaining as to the procedures and criteria govern-
ing the merit pay plan, when the Guild has not agreed to relinquish 
its statutory role." McClatchy Newspapers, Publisher of The Sac-
ramento Bee, 321 N.L.R.B. No. 174 at 6 (1996) (emphasis added).


allow an employer to exert unilateral economic force .... [it 
is legitimate] only as a method for breaking the impasse." 
McClatchy Newspapers, Publisher of The Sacramento Bee, 
321 N.L.R.B. No. 174 at 4 (1996) (McClatchy II). In other 
words, the Board grounded its new "narrow exception" on the 
impact that implementation would have on the collective 
bargaining process:

 Were we to allow the Respondent here to implement its 
 merit wage increase proposal and thereafter expect the 
 parties to resume negotiations for a new collective-
 bargaining agreement, it is apparent that during the 
 subsequent negotiations the Guild would be unable to 
 bargain knowledgeably and thus have any impact on the 
 present determination of unit employee wage rates. The 
 Guild also would be unable to explain to its represented 
 employees how any intervening changes in wages were 
 formulated, given the Respondent's retention of discre-
 tion over all aspects of these increases. Further, the 
 Respondent's implementation of this proposal would not 
 create any fixed, objective status quo as to the level of 
 wage rates, because the Respondent's proposal for a 
 standardless practice of granting raises would allow re-
 curring, unpredictable alterations of wages [sic] rates 
 and would allow the Respondent to initially set and 
 repeatedly change the standards, criteria, and timing of 
 these increases. The frequency, extent, and basis for 
 these wage changes would be governed only by the 
 Respondent's exercise of its discretion.

Id. at 6. Echoing Chief Judge Edwards' de-collectivization 
remark, the decision noted that petitioner's "ongoing ability 
to exercise its economic force in setting wage increases 
[without the Guild's participation] ... would simultaneously 
disparage the Guild by showing ... its incapacity to act as 
the employees' representative in setting terms and conditions 
of employment." Id. The Board took pains to emphasize 
that its holding was limited to a case where an employer 
refused to state any "definable objective procedures and 
criteria" for determining merit. Id. It decided the Modesto 


case by the same reasoning and also found that petitioner had 
threatened the Modesto employees by posting its final offer, 
which had included the no-strike clause. McClatchy Newspa-
pers, Publisher of The Modesto Bee, 322 N.L.R.B. No. 135 
(1996).

 Petitioner criticizes the Board for not adhering to portions 
of the three separate opinions of the judges on the prior 
panel, or in not answering all of the questions posed by those 
judges, but it should be understood that only the per curiam 
opinion is the court's holding. The Board's analysis does rely 
on observations made in the judges' opinions, and the Board 
adopted Chief Judge Edwards' suggestion. Its decision, how-
ever, must be judged on its own bottom--not on whether it 
conforms in whole or in part to the views of individual judges.

 II.

 Although the parties agree the case is one in which peti-
tioner unilaterally implemented the terms of its final offers, it 
does seem somewhat anomalous to refer to the institution of 
the new wage regime as an "implementation of terms." 
Essentially, these wage proposals--particularly the one for 
the Sacramento Bee--have no terms. Indeed, the Board's 
opinion expresses the tentative view that under NLRB v. 
Katz, 369 U.S. 736 (1962), "a wholly discretionary merit wage 
policy (i.e., without identifiable procedures and criteria) does 
not itself 'establish' terms and conditions of employment at 
any point prior to the actual exercise of this discretion in 
setting discrete wage rates for unit employees." McClatchy 
II at 6 n.24 (emphasis added). In other words, the Board 
questioned whether the impasse doctrine should even apply to 
the employer's action. We think there is something to this 
query, but since it is not the Board's holding, we obviously 
cannot rely on it in reviewing the Board's decision.

 Although petitioner's argument is somewhat diffuse, we 
detect three lines of attack against the Board's order. The 
first is that the NLRA--or at least its "settled doctrine"--
contemplates that an employer will be able to implement its 
last offer to the union after impasse; thus, the argument 


goes, the Board either lacked authority to craft the "narrow 
exception" applied in this case or was arbitrary and capricious 
in doing so. Second, petitioner claims that the Board implic-
itly treats its merit pay proposal as a permissive bargaining 
subject, despite the Supreme Court's recognition that compa-
rable management discretion clauses are mandatory subjects 
of bargaining. Finally, the Board is accused of inadequately 
setting forth the boundaries of the exception it has crafted 
and insufficiently reconciling its own precedent.

 * * * *

 The NLRA is wholly silent on the question whether an 
employer may implement its final offer after impasse. To be 
sure, the general language of the Act, including s 8(a)(5) and 
s 8(d), have been authoritatively interpreted by the Supreme 
Court, and the Board is not free under Chevron to alter any 
of the those interpretations even if they otherwise would be 
permissible readings of the Act. See Lechmere, Inc. v. 
NLRB, 502 U.S. 527, 536-37 (1992); Maislin Indus. v. Pri-
mary Steel, Inc., 497 U.S. 116, 131 (1990). But the Supreme 
Court, while it has recognized the Board's doctrine, has never 
held that an employer has the right under the statute to 
implement its final offer, let alone considered whether the 
Board is entitled to craft exceptions to this supposed right.2 
Indeed, not even the Board has ever held that the NLRA 
requires this rule.

 The Board argues, moreover, that its decision does not 
create the only exception to the rule. It contends, and 
petitioner does not dispute, that other clauses--dues check-
off, union security, no-strike, and arbitration clauses--could 
not be implemented unilaterally post-impasse. Insofar as 
dues check-off and union security clauses are exceptions to 
the post-impasse rule, however, it is not because the Board 

__________
 2 See Brown v. Pro Football, Inc., 116 S. Ct. 2116 (1996); 
Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced 
Lightweight Concrete Co., 484 U.S. 539, 544 n.5 (1988); Charles D. 
Bonanno Linen Serv. v. NLRB, 454 U.S. 404 (1982); NLRB v. 
Katz, 369 U.S. 736, 745 n.12 (1962); NLRB v. Crompton-Highland 
Mills, Inc., 337 U.S. 217, 224 (1949).


has authority to treat them as such; rather, the NLRA 
requires that these clauses be exceptions, because they are 
legal only if authorized by a collective bargaining agreement. 
See 29 U.S.C. s 158(a)(3) (1994). As for arbitration clauses, it 
would seem that just as a union cannot force an employer to 
arbitrate after an agreement has expired, an employer cannot 
force a union to arbitrate when no agreement has been 
reached. See generally Litton Fin. Printing Div. v. NLRB, 
501 U.S. 190 (1991). But that proposition, if true, appears to 
rest not so much on a Board-crafted exception to the post-
impasse rule, but rather on general principles of contract 
interpretation under s 301 of the Labor Management Rela-
tions Act. See Litton, 501 U.S. at 203-04; see also 29 U.S.C. 
s 171(b) (1994) (the United States encourages voluntary arbi-
tration).

 The Board's treatment of no-strike conditions, on the other 
hand, is somewhat more analogous. The Board has held that 
because the right to strike is "fundamental," it cannot be 
relinquished by employees except by consent--which implies 
a specific contractual waiver. Gary-Hobart Water Corp., 210 
N.L.R.B. No. 87 at 744 (1974). It follows, therefore--al-
though the Board has never expressly so held--that an 
employer could not impose no-strike conditions post-impasse 
even if embodied in its final contract proposal. It will be 
recalled that the Board's McClatchy II decision still has 
fragments of its original waiver theory, and the Board's 
description of wages as of "paramount" concern is certainly 
akin to its description of the right to strike as "fundamental." 
And, if the Board's conclusory waiver rationale as applied to 
no-strike conditions were ever challenged, it would surely say, 
as it has in these cases, that a unilateral imposition of a no-
strike condition would also impair the process of collective 
bargaining--without the right to strike, the union's future 
bargaining position would be devastated.

 Even if the Board has never before determined that an 
exception to its doctrine was warranted, however, it is not 
clear that the statute prevents it from doing so in this case. 
Petitioner argues that this exception is inconsistent with 
NLRB v. Insurance Agents' International Union, AFL-CIO, 
361 U.S. 477 (1960), which forbids the Board to act "as an 


arbiter of the sort of economic weapons the parties can use in 
seeking to gain acceptance of their bargaining demands." Id. 
at 497. But the Supreme Court, in Charles D. Bonanno 
Linen Service v. NLRB, 454 U.S. 404 (1982), has also empha-
sized that the Board has wide latitude to monitor the bargain-
ing process. There, bargaining between the union and a 
multi-employer bargaining unit had reached impasse. The 
union selectively struck Bonanno Linen and attempted to 
reach secret interim agreements with some of the other 
employers. This "whipsaw" technique was designed to force 
a presumably stronger employer like Bonanno Linen to yield 
to the union's demands, carrying the rest of the unit with it 
and ending the impasse. In response, however, Bonanno 
Linen replaced striking workers and notified both the union 
and the other employers that it was withdrawing from the 
bargaining unit. The Board held that a bargaining impasse, 
even when combined with a selective strike and the specter of 
interim agreements, was not an "unusual circumstance" justi-
fying an employer's unilateral withdrawal from the unit. An 
employer can only withdraw if it is subject to extreme finan-
cial pressures or if the bargaining unit has become substan-
tially fragmented. Id. at 411. In the Board's view, giving an 
individual employer the ability to withdraw at impasse would 
threaten the stability of multi-employer bargaining units, 
because dissatisfied employers could walk away instead of 
working out differences. Id. at 412 n. 8.

 The Supreme Court deferred to the Board's "rule," not-
withstanding strong dissents arguing that the Board had 
unfairly tied the hands of employers. As one pair of dissen-
ters protested, "With one or more competitors fully back in 
business, the ability of the remaining employers to resist the 
union demands becomes greatly--and unfairly--diminished." 
Id. at 422 (Burger, C.J., dissenting). The majority did not 
dispute that the Board's decision reduced the struck employ-
er's bargaining power--but the majority, as opposed to the 
dissenters, did not think this necessarily beyond the Board's 
reach. In Insurance Agents', the Board had held that the 
union's use of slow-downs, sit-ins, leafleting, and picketing 


was a per se violation of its obligation to bargain in good faith 
under s 8(b)(3), the union counterpart to s 8(a)(5).3 In re-
versing, the Court emphasized that the Board had taken an 
erroneous view of collective bargaining, a system in which 
good-faith bargaining and economic weapons must coexist. 
Id. at 489. But the Court also noted that while economic 
pressure is not itself inconsistent with s 8(b)(3), the "unique 
character" of particular tactics might be inconsistent with 
collective bargaining. Id. at 488. In keeping with this point, 
the Court in Bonanno Linen concluded that the Board could 
"deny an employer a particular economic weapon ... in the 
interest of the proper and pre-eminent goal, maintaining the 
stability of the muliemployer bargaining unit." Bonanno 
Linen, 454 U.S. at 419.

 Thus it is true, as petitioner stresses, that Insurance 
Agents' prohibited the Board from "act[ing] at large in equal-
izing disparities of bargaining power between employer and 
union." Insurance Agents', 361 U.S. at 428. But it is also 
true, as Bonanno Linen makes apparent, that regulating the 
process of collective bargaining may involve the Board in 
making determinations that necessarily implicate--if they do 
not rest directly on--the Board's appraisal of conditions that 
will affect the parties' bargaining power. Although the line 
between economic neutrality and authority over process is 
exceedingly difficult to draw, we think that this case is 
marginally closer to Bonanno Linen than to Insurance 
Agents'. Here, as in Bonanno Linen, the Board has denied 
the employer a particular economic tactic for the sake of 
preserving the stability of the collective bargaining process.

 The post-impasse rule itself regulates process through pow-
er. The Board has told us that its rationale for permitting an 
employer to unilaterally implement its final offer after im-

__________
 3 Insurance Agents', 361 U.S. at 482. Of course, a union's 
tactics, no matter how troubling or even independently unlawful, 
are always designed to reach a collective bargaining agreement. 
An employer, on the other hand, may well wish to break the union. 
Neither the Board nor the Supreme Court has mentioned this 
asymmetrical factor, but it may have affected decisions.


passe is that such an action breaks the impasse and therefore 
encourages future collective bargaining.4 The theory might 
well be thought somewhat strained, for it does not explain 
why the Board decided to handle impasse with this rule 
instead of another. The Board could have adopted, for 
example, a rule requiring the status quo to remain in effect 
until either the union or the employer was willing to resume 
negotiations. Stagnancy might pressure both the employer 
and the union to bend. But the rule it did choose--allowing 
the employer to implement its final offer--moves the process 
forward by giving one party, the employer, economic lever-
age. And in this case, where the employer has advanced no 
substantive criteria for its merit pay proposal, the Board has 
decided that the economic power it has granted would go too 
far. Rather than merely pressuring the union, implementa-
tion might well irreparably undermine its ability to bargain. 
Since the union could not know what criteria, if any, petition-
er was using to award individual salary increases, it could not 
bargain against those standards; instead, it faced a discre-
tionary cloud. As the Board put it, "the present case repre-
sents a blueprint for how an employer might effectively 
undermine the bargaining process while at the same time 
claiming that it was not acting to circumvent its statutory 
bargaining obligation." McClatchy II at 6. We think that it 
is within the Board's authority to prevent this development:

 [T]he Board, employing its expertise in the light of 
 experience, has sought to balance the 'conflicting legiti-

__________
 4 We can find, however, no "seminal case" setting forth the 
Board's rationale underlying the impasse rule. Cf. Ellen J. Dannin, 
Collective Bargaining Impasse and Implementation of Final Of-
fers: Have We Created a Right Unaccompanied by Fulfillment? 
19 U. Tol. L. Rev. 41, 44 n.7 (1987). Taft Broadcasting Co., 163 
N.L.R.B. No. 55 (1967), enf. sub nom. AFTRA v. NLRB, 395 F.2d 
622 (D.C. Cir. 1968), is usually cited as the prime case, but Taft 
assumes the existence of the rule and goes on to list criteria for 
determining whether impasse has been reached in good-faith. The 
cases that best describe the Board's rationale are Hiway Bill-
boards, Inc., 206 N.L.R.B. No. 1 (1973) and Bi-Rite Foods, Inc., 147 
N.L.R.B. No. 11 (1964).


 mate interests' in pursuit of the 'national policy of pro-
 moting labor peace through strengthened collective 
 bargaining.' The Board might have struck a different 
 balance from the one it has, and it may be that some 
 or all of us would prefer that it had done so. But as-
 sessing the significance of impasse and the dynamics 
 of collective bargaining is precisely the kind of judg-
 ment that Buffalo Linen ruled should be left to the 
 Board.

Bonanno Linen, 454 U.S. at 413 (emphasis added) (citations 
omitted). Of course, if relative bargaining strength were not 
a matter that the Board could consider in determining wheth-
er petitioner's action furthered the collective bargaining pro-
cess, the Board's reasoning would be vulnerable. But that is 
not how we read Bonanno Linen.

 Not only does an employer's implementation of a proposal 
such as petitioner's deprive the union of "purchase" in pursu-
ing future negotiations, the Board also concluded that by 
excluding the union from the process by which individual 
rates of pay are set petitioner "simultaneously disparag[ed] 
the Guild by showing ... its incapacity to act as the employ-
ees' representative in setting terms and conditions of employ-
ment." McClatchy II at 6. It knew no specifics about the 
merit raises, therefore it had no information to relay. In that 
regard, the Board echoed concerns expressed in Chief Judge 
Edwards' prior concurring opinion that petitioner's implemen-
tation of its proposal could be seen as seeking de-
collectivization of bargaining.5 The Board concluded that 

__________
 5 De-collectivization concerns are related to concerns about 
direct dealing, although direct dealing is not itself at issue in this 
case. In Toledo Typographical Union No. 63 v. NLRB, 907 F.2d 
1220 (D.C. Cir. 1990), the court, reversing the Board, held that a 
proposal for direct employer-employee negotiations over retirement 
buyouts was a permissive subject upon which an employer could not 
insist to impasse. The Board has not, however, applied Toledo 
Blade to proposals that preserve some role for the union as 
bargaining agent. In Cincinnati Newspaper Guild, Local 9 v. 
NLRB, 938 F.2d 284 (D.C. Cir. 1991), the court upheld the Board's 
determination that an employer committed no unfair labor practice 


petitioner's action was "so inherently destructive of the fun-
damental principles of collective bargaining that it could not 
be sanctioned as part of a doctrine created to break impasse 
and restore active collective bargaining." McClatchy II at 6 
(citations omitted). Petitioner particularly objects to this 
passage, arguing that the phrase "inherently destructive"--
which, as the Board acknowledges, comes from NLRB v. 
Great Dane Trailers, 388 U.S. 26 (1967)--applies only to 
employer behavior that is claimed to violate s 8(a)(3), the 
anti-discrimination provision of the Act. But the Board ex-
plained that it was using the term only to show that, as in 
Great Dane, the employer's action will have "foreseeable 
consequences" notwithstanding its motive. We do not see 
why that observation is independently objectionable.

 * * * *

 Nevertheless, petitioner contends that the Board's logic is 
inconsistent with NLRB v. American National Insurance, 
343 U.S. 395 (1952), which held that a clause giving an 
employer discretion over "management functions" such as 
promotions, discipline and work scheduling is a mandatory 
subject of bargaining--i.e., one on which an employer is 
entitled to insist to the point of impasse. The Court there 
said that the Board is not entitled to "sit in judgment upon 
the substantive terms of collective bargaining agreements," 
id. at 404, and petitioner asserts that the Board is doing just 
that in this case. The Board, petitioner argues, has really 
based its entire reasoning on its judgment about the sub-
stance of petitioner's pay proposal.

 It seems to us that petitioner may well overread American 
National Insurance. The Court there dealt with a manage-
ment functions clause that was traditional in the insurance 
industry. Can one imagine employee's pay--in any indus-

__________
by insisting to impasse on a unilateral merit pay plan because the 
plan allowed the union to participate in the grievance procedure. 
The Board seems to have followed Cincinnati Newspaper Guild in 
this case, and it has not been suggested that McClatchy's merit pay 
plan was a permissive subject.


try--being described as a subject of a management functions 
clause? And the Court held only that "[a]ny fears the Board 
may entertain that use of management functions clauses will 
lead to evasion of an employer's duty to bargain collectively 
as to 'rates of pay, wages, hours, and conditions of employ-
ment' do not justify condemning all bargaining for manage-
ment functions clauses concerning any 'condition of employ-
ment'...." Id. at 409 (emphasis added). We rather doubt 
that American National Insurance means that no employer 
proposal could be condemned as a per se indication of bad 
faith bargaining. Suppose, for instance, an employer pro-
posed that all working conditions, including wages and hours, 
were to be determined in accordance with the employer's 
total discretion. The offered agreement would have just 
three clauses: (1) union recognition, (2) the employer's discre-
tion over all terms, and (3) a no-strike clause. That would 
seem to be the paradigm management functions clause "evad-
ing" the employer's collective bargaining duty.

 In any event, the Board did not hold, as it did in American 
National Insurance, that petitioner's insistence on its pay 
proposal was a permissive subject of bargaining; petitioner 
was therefore entitled to insist on it to impasse. Petitioner 
claims, however, that by declaring its "implementation" after 
impasse illegal the Board has done indirectly what it could 
not do directly. If an employer cannot implement its propos-
al then the union has a permanent "veto," see Colorado-Ute 
Elec. Ass'n v. NLRB, 939 F.2d 1392, 1404 (10th Cir. 1991), 
which, it is argued, is simply another way for the Board to 
treat an employer's insistence on the proposal as illegal. 
Petitioner's argument has a good deal of force, but it does not 
quite carry the day. As the Board's counsel pointed out, the 
two steps of bargaining to impasse and implementing after 
impasse are not practically equivalent and therefore can be 
judged according to different standards. If a party can force 
an impasse over a subject, its authority to do so gives it 
significant leverage over all other matters. That ability is not 
lost--at least not totally--by the Board's holding that the 
same proposal may not be unilaterally implemented after 
impasse.


 Admittedly, an employer in this situation is somewhat 
"stuck" on its wage proposal. Normal labor market pres-
sures presumably will require it to increase salaries. (But as 
we noted earlier, the stalemate could pressure the union as 
well. See infra p. 12.) It can, of course, bargain ad hoc with 
the union as to each increase, but transaction costs might (or 
might not) make that infeasible. We cannot visualize exactly 
how various scenarios would play out--and it is not our job to 
do so; it is the Board's authority over the "dynamics of 
collective bargaining" to which we must defer. It is impor-
tant to recognize, however, that the Board's decision does not 
prevent an employer from implementing a merit pay proposal 
post-impasse--so long as the proposal defines "merit" with 
objective criteria.

 The Board's conclusion that petitioner may not unilaterally 
implement its proposal certainly draws from the substance of 
that proposal. But that is not unprecedented. To some 
degree, the Board often considers substance when regulating 
process. The Board must look to the content of a proposal to 
decide whether a subject is mandatory or permissive under 
s 8(d). See NLRB v. Wooster Div. of Borg-Warner Corp., 
356 U.S. 342 (1958).6 As petitioner itself concedes, the Board 
may consider the content of a proposal when making a 
determination whether the employer is engaged in "surface 
bargaining." See, e.g., NLRB v. Pacific Grinding Wheel Co., 
572 F.2d 1343, 1348 (9th Cir. 1978). Here, as in those 
instances, the Board's reliance on substance is not the same 
as "compelling McClatchy to agree to a proposal." See 29 
U.S.C. s 158(d).

 The Tenth Circuit, in Colorado-Ute, strongly suggests a 
contrary view. Relying on American National Insurance, it 
said that the employer had a "right" to use the "economic 
weapon of implementing at impasse" and that "this right 
exists irrespective of the parties' bargaining positions." 
Colorado-Ute, 939 F.2d at 1404. But the case before the 

__________
 6 Indeed, Justice Harlan dissented in Borg-Warner primarily 
because he thought that categorizing bargaining subjects involved 
the Board too much in the substance of the proposal. The majority 
of the Court, however, did not think this inconsistent with either 
American National Insurance or the Act itself.


Tenth Circuit rested on the Board's initial waiver theory that 
we too rejected. The Board did not rely in Colorado-Ute on 
its authority under Bonanno Linen to "assess[ ] the signifi-
cance of impasse and the dynamics of collective bargaining." 
See Bonanno Linen, 454 U.S. at 413. The Tenth Circuit thus 
did not actually decide the precise issue before us; its opin- 
ion does not even mention Bonanno Linen. Moreover, 
Colorado-Ute may be distinguishable even under the Board's 
new rationale. The Tenth Circuit was under the impression 
that the merit increases limited the employer's discretion to 
the extent that they were linked to the identifiable criteria of 
"job performance" and "contribution on the job." 7

 * * * *

 Finally, petitioner argues that the Board has not explained 
adequately why it is making an exception for a proposal that 
affords an employer complete discretion over the grounds for 
and timing of wage increases. Petitioner asks, why are 
wages to be thought different than hours or other working 
conditions the statute also treats as mandatory subjects of 
bargaining? The Board explained that wages are "a key 
term and condition of employment and a primary basis of 
negotiations," McClatchy II at 6. That proposition, drawn 
perforce from the Board's expertise, seems hard to challenge 
in a reviewing court. The Board also thought its conclusion 
that wages were of "paramount importance" was supported 
by the wording of s 8(d), which lists wages first before hours 
and working conditions as subjects for collective bargaining. 
It does seem that the order--particularly when one considers 
that wages are, after all, a working condition and are none-
theless separately mentioned--is a legitimate point, if only a 
make-weight.

__________
 7 Our reading of the Board's decision in Colorado-Ute, howev-
er, suggests that "merit" pay was as substantively standardless 
there as here. Colorado-Ute Elec. Ass'n, 295 N.L.R.B. No. 67 
(1989). Colorado-Ute's proposal did limit the employer's discretion 
as to amount, because increases were granted within a fixed range 
of progression steps. Id.


 Admittedly, the Board's explanation as to why wages would 
be treated differently than, let us say, the decisions covered 
by the management functions clause in American National 
Insurance, is hardly a full one; it is surely not as extensive as 
the judges on the prior panel had wished. Nevertheless, we 
recognize the issue is analytically difficult and appreciate the 
Board's desire to proceed cautiously. Perhaps any hard and 
fast boundary drawing will force the Board prematurely to 
decide legal policy issues; agencies are entitled, just as 
courts, to proceed case by case. Stereo Broadcasters, Inc. v. 
FCC, 652 F.2d 1026, 1031 (D.C. Cir. 1981). We think the 
Board is free to draw on its expertise to determine that 
wages are typically of paramount importance in collective 
bargaining and to suggest that wages, unlike scheduling or a 
host of other decisions generally thought closely tied to 
management operations, are expected to be set bilaterally in 
a collective bargaining relationship.8

 Petitioner also claims that the Board inadequately ex-
plained its deviation from its reasoning in prior cases. But 
the Board simply overruled portions of those decisions incon-
sistent with its reasoning in this case. Agencies are entitled 
to do just that.

 III.

 Section 8(a)(1) of the Act makes it an unfair labor practice 
for an employer to "interfere with, restrain or coerce" em-
ployees in the exercise of the rights guaranteed by s 7 of the 
Act. 29 U.S.C. s 158(a)(1) (1994). The Board found that 
McClatchy threatened its Modesto Bee employees with dis-
charge in violation of s 8(a)(1) by posting its final offer, which 
included a no-strike/no-picketing clause. Petitioner claims, 
however, that both the Amended Complaint and the hearing 

__________
 8 We think the Board also has the authority to decide that 
having fixed standards as well as fixed timing for considering raises 
is necessary if an employer wishes to implement its proposal. Thus 
we find no fault with the Board's decision to treat the Modesto and 
Sacramento proposals identically, even though Modesto had fixed 
timing.


before the ALJ focused only on whether McClatchy had an 
"affirmative duty to explain" the nonbinding nature of the no-
strike clause rather than on whether the posting "threatened" 
the employees. Therefore, petitioner argues, the charge 
violates its due process rights because "[t]he Board may not 
make findings or order remedies on violations not charged in 
the General Counsel's complaint or litigated in the subse-
quent hearing." NLRB v. Blake Constr. Co., 663 F.2d 272, 
279 (D.C. Cir. 1981). We think that McClatchy is splitting 
hairs. The Amended Complaint described the posting of the 
no-strike provision and alleged that McClatchy failed "[to 
give] notice to employees that a no-strike proposal as de-
scribed therein is not enforceable in the absence of a binding 
contract between the parties, and that, without such a binding 
contract, employees were free to strike." It is hard to say 
that petitioner was not on notice that the General Counsel 
thought the posting misled the employees into thinking that 
McClatchy would fire them for striking. Why would there be 
a question of McClatchy's clarifying the notice if it caused no 
confusion? Even assuming that this pleading is not specific 
enough, however, due process is satisfied if the issue is "fairly 
tried by the parties." Petitioner relies on Blake Construc-
tion, but there, although the General Counsel never alleged 
that the Company's treatment of non-union employees 
amounted to a violation of s 8(a)(1) or (5), the Board found an 
unfair labor practice on that ground. Here, the General 
Counsel alleged from the beginning that the posting violated 
s 8(a)(1); both the "affirmative duty to inform" and the 
"threatening" theories focused on same portion of the statute 
and the same set of facts. Granted, the General Counsel 
slightly shifted his legal theory after the hearing, but 
McClatchy has not argued that it would have litigated the 
issue differently at the hearing had it faced the "threatening" 
theory. To the contrary, petitioner has used the same argu-
ments to counter both theories: that the union notified the 
employees of their rights and that McClatchy took no retalia-
tory action when employees picketed. The issue was thus 
"fairly tried."


 We nevertheless agree with petitioner that the s 8(a)(1) 
violation is not supported by substantial evidence. In evalu-
ating an employer's conduct under s 8(a)(1), the Board must 
consider "whether the conduct in question had a reasonable 
tendency in the totality of the circumstances to intimidate." 
NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir. 1985) 
(quoting Corrie Corp. v. NLRB, 375 F.2d 149,153 (4th Cir. 
1967)). In this case, the circumstances raise such a weak 
inference of intimidation that it is an intolerable stretch to say 
that substantial evidence supports it. The no-strike clause, 
which was buried in the document as "subsection 23.1," 
stated:

 During the term of this Agreement the Guild and its agents 
 will not cause, permit, condone, encourage, or sanction and 
 no employee or employees of the Publisher will participate 
 or engage in any strike.... Any employee or employees 
 covered by this Agreement engaging in any such activity 
 shall be subject to immediate discharge as said misconduct 
 shall constitute just cause for discharge under this Con-
 tract.

(emphasis added). In characterizing the posting as a threat, 
the ALJ relied on what he described as the "negative preg-
nant" of the offer's cover page, which noted that "the Publish-
er reserves the right not to apply any provision of these 
terms and conditions that depends upon the existence of a 
binding contract between the parties for enforceability." 
This wording, the ALJ thought, implied that McClatchy had 
the authority to enforce the no-strike clause if it so wished. 
Other language in the posting, however, cuts against this 
strained inference. The no-strike clause itself began by 
saying it was enforceable "[d]uring the term of this Agree-
ment," and the memorandum accompanying the posted offer 
emphasized several times that the Company and the union 
had "been unable to reach agreement" and that there was "no 
contract." The union represents educated employees who 
work in the editorial department. No evidence in the record 
suggests that these employees did not understand that the 
no-strike clause only applied during an agreement. Indeed, 


the employees picketed, suggesting that they felt no threat. 
We decline to enforce this portion of the Board's order.

 * * * *

 This case presents a difficult question because of the 
tension between the Supreme Court decisions bearing on the 
Board's limited exception to the post-impasse rule. We cer-
tainly understand how Board members can come to different 
conclusions--witness member Cohen's dissent. McClatchy II 
at 7. The question is even more difficult for us as a reviewing 
court, and we are obliged to admit that we are unsure 
ourselves as to the right answer. Under those circumstances, 
we think the appropriate course, keeping in mind the Board's 
"primary responsibility for developing and applying national 
labor policy," Chamber of Commerce v. Reich, 74 F.3d 1322, 
1334 (D.C. Cir. 1996) (quoting NLRB v. Curtin-Matheson 
Scientific, Inc., 494 U.S. 775, 786 (1990)), is to defer to the 
Board's interpretation of the Act.